Arnold P. Peter (SBN: 120091)
    apeter@peterlawgroup.com
Juan Carlos Londono (SBN:  249450)
    clondono@peterlawgroup.com
Eyal Farahan (SBN: 314849)
    efarahan@peterlawgroup.com
**PETER LAW GROUP**
270 Coral Circle
El Segundo, CA  90245
T: (310) 432-0500
F: (310) 432-0599

Asher Hoffman, (SBN 346362)
    ah@asherhoffmanlaw.com
**LAW OFFICE OF ASHER HOFFMAN, APC**
4929 Wilshire Blvd, Suite 410,
Los Angeles, CA 90010
T: (323) 907-3811
F: (323) 784-7600

Attorneys for Plaintiff Q'orianka Kilcher

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Q'ORIANKA KILCHER, an individual,<br><br>Plaintiff,<br><br>v.<br><br>JAMES CAMERON, an individual; LIGHTSTORM ENTERTAINMENT, INC., a Delaware Corporation; TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware Corporation; THE WALT DISNEY COMPANY, a Delaware Corporation; AVATAR ALLIANCE FOUNDATION; STAN WINSTON STUDIOS, LLC, a California entity; GENTLE GIANT STUDIOS, INC., a California Corporation; WETA DIGITAL LIMITED, a New Zealand entity; INDUSTRIAL LIGHT & MAGIC, a division of Lucasfilm Ltd. LLC, a California entity; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br>1. False Endorsement and False Designation of Origin (Lanham Act, 15 U.S.C. § 1125(a)(1)(A))<br>2. Common Law Commercial Misappropriation of Likeness (Right of Publicity)<br>3. Violation of California Statutory Right of Publicity (Cal. Civ. Code § 3344<br>4. False Light Invasion of Privacy<br>5. Intrusion Upon Seclusion (Invasion of Privacy)<br>6. Public Disclosure of Private Facts<br>7. Unauthorized Digital Replica in Sexually Explicit Depiction ("Deepfake Porn" - Civ. Code 1708.86)<br>8. Intentional Interference with Prospective Economic Advantage<br><br>ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF |

**COMPLAINT FOR DAMAGES**

PETER LAW GROUP
270 Coral Circle
El Segundo, California 90245
TEL. 310.277.0010 ♦ FAX 310.432.0599

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................1

II.  SUMMARY AND NATURE OF CLAIMS .............................................2

III.  JURISDICTION AND VENUE ..............................................................4

IV.  PARTIES ..................................................................................................5

   A.  PLAINTIFF Q'ORIANKA KILCHER:  INDIGENOUS ACTRESS AND ACTIVIST WHOSE IDENTITY WAS EXPLOITED ...........................................................5

   B.  DEFENDANT JAMES CAMERON:  ICONIC FILMMAKER AND PRINCIPAL ARCHITECT OF THE MISAPPROPRIATION .......................................................6

   C.  DEFENDANT LIGHTSTORM ENTERTAINMENT, INC.: CAMERON'S PRODUCTION COMPANY AND INSTRUMENT OF MISAPPROPRIATION .......................................7

   D.  DEFENDANT WALT DISNEY COMPANY (INCLUDING DISNEY ENTERPRISES, INC.): SUCCESSOR-IN-INTEREST THAT CONTINUED AND EXPANDED THE EXPLOITATION THROUGH SEQUELS ...............................................................8

   E.  DEFENDANT AVATAR ALLIANCE FOUNDATION .......................................8

   F.  DEFENDANT STAN WINSTON STUDIOS, LLC ("STAN WINSTON STUDIOS")........9

   G.  DEFENDANT GENTLE GIANT STUDIOS, INC. ("GENTLE GIANT") .......................9

   H.  DEFENDANT WETA DIGITAL LIMITED ("WETA DIGITAL")............................10

   I.  DEFENDANT INDUSTRIAL LIGHT & MAGIC ("ILM") ..................................10

   J.  LIGHTSTORM ENTERTAINMENT, INC. AS CENTRAL COORDINATING INTERMEDIARY ...............................................................................11

   K.  ALTER EGO LIABILITY AND AGENCY RELATIONSHIPS ...............................11

      1.  *Alter Ego Liability* ....................................................................11

      2.  *Agency And Joint Venture* ...........................................................13

      3.  *Cameron As Agent Of Corporate Defendants*..................................14

      4.  *Lightstorm As Instrumentality Of Cameron* ...................................14

      5.  *Fox As Principal/Joint Venturer* ..................................................14

      6.  *Disney As Successor And Continuing Wrongdoer* ............................14

      7.  *Ratification Of Wrongful Activity* ...............................................15

      8.  *Joint And Several Liability* .........................................................16

V.  STATEMENT OF FACTS ...................................................................16

   A.  CLEAR PATTERN OF MISAPPROPRIATING INDIGENOUS CULTURE IN *AVATAR (2009)* ...................................................................................16

   B.  EXPLOITATION OF A 14-YEAR-OLD INDIGENOUS GIRL'S LIKENESS – .............19 THE CREATION OF "NEYTIRI" ................................................................19

      1.  *From Creative Failure to Deliberate Appropriation*.........................19

      2.  *Locking In a Minor's Likeness Without Consent:  Plaintiff's Facial Features Become the Immutable "Blueprint" for Neytiri* ........................20

      3.  *A Billion-Dollar Character Built On An Uncredited Indigenous Child* ........................................................................................23

   C.  PLAINTIFF'S UNWITTING DISCOVERY OF THE TRUTH AND DEFENDANTS' CONCEALMENT (TOLLING OF THE STATUTE OF LIMITATIONS)...........................24

      1.  *A Gift That Concealed The Truth*................................................24

      2.  *Years Of Assurances And Strategic Silence Lulling Plaintiff Into Inaction*....................................................................................27

i

**COMPLAINT FOR DAMAGES**

D.  DEFENDANTS' USE WAS NOT "TRANSFORMATIVE" – IT WAS THEFT DISGUISED AS ART (FIRST AMENDMENT DEFENSE DOES NOT APPLY) ...................32
   1.  *The Claims Do Not Arise From "Protected Activity" Under Cal. Code Civ. Proc. § 425.16* ...................33
   2.  *Even Assuming Protected Activity Is Found, Defendants' Use Is Not Transformative* ...................34
   3.  *Preservation, Not Transformation: Defendants Copied Plaintiff's Face Rather Than Altering It* ...................35
   4.  *Commercial Exploitation, Not Protected Expression: Plaintiff's Likeness Was Used To Sell A Product, Not To Convey A Unique Message* 36
E.  A DIGITAL CLONE HIDDEN BEHIND CGI: "TRANSFORMATIVE USE" IS A POST HOC JUSTIFICATION FOR THEFT ...................37

VI.  CLAIMS FOR RELIEF ...................39

COUNT I FALSE ENDORSEMENT AND FALSE DESIGNATION OF ORIGIN (AGAINST ALL DEFENDANTS) (LANHAM ACT, 15 U.S.C. § 1125(A)(1)(A)) .40

COUNT II COMMON LAW COMMERCIAL MISAPPROPRIATION OF LIKENESS ...................44

(RIGHT OF PUBLICITY) (AGAINST ALL DEFENDANTS) ...................44

COUNT III ...................47

VIOLATION OF CALIFORNIA STATUTORY RIGHT OF PUBLICITY (CAL. CIV. CODE § 3344) (AGAINST ALL DEFENDANTS) ...................47

COUNT IV ...................51

FALSE LIGHT INVASION OF PRIVACY (AGAINST ALL DEFENDANTS) ...51

COUNT V ...................55

INTRUSION UPON SECLUSION (INVASION OF PRIVACY) (AGAINST ALL DEFENDANTS) ...................55

COUNT VI ...................58

PUBLIC DISCLOSURE OF PRIVATE FACTS (AGAINST ALL DEFENDANTS, IN THE ALTERNATIVE TO FALSE LIGHT) ...................58

COUNT VII STATUTORY UNAUTHORIZED DIGITAL REPLICA IN SEXUALLY EXPLICIT DEPICTION ("DEEPFAKE PORN" - CAL. CIV. CODE § 1708.86)(AGAINST ALL DEFENDANTS) ...................60

STATUTORY UNAUTHORIZED DIGITAL REPLICA IN SEXUALLY EXPLICIT DEPICTION ("DEEPFAKE PORN" – CAL. CIV. CODE § 1708.86) (AGAINST ALL DEFENDANTS) ...................60

COUNT VIII INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE ...................66

(AGAINST ALL DEFENDANTS) ...................66

VII.  ANTI-SLAPP STATEMENT ...................74

VIII.  PRAYER FOR RELIEF ...................76

IX.  DEMAND FOR JURY TRIAL ...................81

X.  LIST OF FIGURES ...................82

ii

**COMPLAINT FOR DAMAGES**

Plaintiff Q'ORIANKA KILCHER, by and through her undersigned counsel, brings this Complaint against Defendants JAMES CAMERON, LIGHTSTORM ENTERTAINMENT, INC., TWENTIETH CENTURY FOX FILM CORPORATION, THE WALT DISNEY COMPANY, and AVATAR ALLIANCE FOUNDATION (collectively, "Defendants"), and alleges as follows:

## I.   INTRODUCTION

1. This case exposes how one of Hollywood's most powerful filmmakers exploited a young Indigenous girl's biometric identity and cultural heritage to create a record-breaking film franchise - without credit or compensation to her - through a series of deliberate, non-expressive commercial acts. Plaintiff Q'orianka Kilcher, a Native Peruvian actress and activist, was only 14 years old when director James Cameron extracted, replicated, and commercially deployed her facial likeness as functional biometric source data in Avatar's character design pipeline, without her knowledge or consent. This action does not seek to restrict or punish speech or artistic expression; it seeks to remedy the unlawful taking of Plaintiff's property: her own face, used as a commercial production asset to generate billions of dollars in profit. The gravamen of each count is conduct - the unauthorized extraction and commercial use of Plaintiff's physical likeness - not the expressive content of any film. Cameron's initial film in the series grossed nearly $3 billion worldwide, becoming the highest-grossing movie of all time, yet it was built in material part on the misappropriation of a minor's biometric facial features as unpaid commercial source material.

2. James Cameron selected the facial features of Q'orianka Kilcher - a fifteen-year-old Quechua-Huachipaeri girl at the time - as the source for the lead female character Neytiri in the Avatar film franchise. Cameron first utilized Plaintiff's likeness at the two-dimensional sketch design stage by rendering an early facial sketch of Neytiri directly from a specific photograph of Kilcher. That production sketch was circulated within the art department for character design purposes.

1

**COMPLAINT FOR DAMAGES**

In a subsequent production stage, Cameron separately reaffirmed that same facial selection at the sculptural maquette stage, directing lead character designer Jordu Schell to create physical busts and maquettes - three-dimensional sculptural reference models used to define and establish a character's facial geometry prior to digital scanning - informed by multiple photographic references of Kilcher. Those sculptural forms were thereafter reviewed and approved by Cameron, then three-dimensionally scanned at high resolution to generate a digital facial model incorporated as a production asset within a standardized digital data workflow used to maintain character consistency across multiple vendors.

3. These parallel uses - first in two-dimensional sketch form, then in physical three-dimensional sculpture, and ultimately in digital CGI models - demonstrate a deliberate and repeated systemic use of Plaintiff's facial features as the source for the character of Neytiri, systematically propagated across downstream digital production assets. Cameron himself has stated in interviews that the Na'vi were conceived as "photographically real humanoids," not abstract aliens, and were intentionally designed to retain human-recognizable anatomy, facial structure, and proportions as a core aesthetic objective. This was done without Kilcher's knowledge or consent. The result was a hugely lucrative film franchise that presented itself as sympathetic to Indigenous struggles, all while silently exploiting a real Indigenous youth behind the scenes.

## II.   SUMMARY AND NATURE OF CLAIMS

4. Plaintiff brings the following causes of action against Defendants:

- Common Law Misappropriation of Likeness (Right of Publicity): For taking and using Plaintiff's identity for commercial gain without consent.
- Statutory Right of Publicity (Cal. Civ. Code § 3344): For the knowing, unauthorized use of Plaintiff's likeness in products, merchandise, and advertising.

**2**

**COMPLAINT FOR DAMAGES**

- False Light Invasion of Privacy: For publicly casting Plaintiff in a false light by using her likeness without credit or disclosure, implying consent or involvement where there was none.

- Intrusion Upon Seclusion: For intruding into Plaintiff's private life and personal autonomy by extracting and using her biometric facial features without permission.

- Public Disclosure of Private Facts: For publicly exposing intimate aspects of Plaintiff (her facial identity and its use in a sexual context) that would be offensive and not of legitimate public concern.

- Defamation (Libel and Slander): For false statements and implications (such as the "busy with another movie" excuse) that harmed Plaintiff's reputation.

- Negligence: For breaching duties of care by using a minor's likeness without safeguards or consent, causing foreseeable harm.

- Unauthorized Digital Replica in Explicit Context (Deepfake Porn – Civ. Code § 1708.86): For creating and distributing a digitized, sexually explicit depiction of Plaintiff (via the *Neytiri* character's love scene) without her consent.

- Intentional Interference with Prospective Economic Advantage: For wrongfully sabotaging Plaintiff's career opportunities and economic expectancies by exploiting her likeness while excluding and deceiving her.

- Negligent Misrepresentation: In the alternative to intentional fraud, for making false statements (e.g., that Plaintiff was unavailable and merely an "inspiration") without reasonable grounds, inducing Plaintiff's reliance to her detriment.

5. Each and every cause of action alleged herein arises from Defendants' unlawful commercial conduct - specifically, the unauthorized extraction, replication, digitization, and systematic commercial deployment of Plaintiff's biometric facial likeness as functional production data in a for-profit character design pipeline -

3

**COMPLAINT FOR DAMAGES**

and not from any act of protected free speech or expressive content of the Avatar films.

6. The gravamen of this Complaint is Defendants' non-expressive, commercial misappropriation of a private individual's physical identity for profit. Because the wrongful conduct at issue consists of commercial acts of appropriation - independently tortious under California and federal law - rather than any statement, publication, or exercise of creative expression, this action does not arise from activity protected under California Code of Civil Procedure § 425.16.

7. Should Defendants move to strike any claim under the anti-SLAPP statute, Plaintiff contends: (a) the commercial conduct alleged is not "protected activity" under  425.16(e) because it constitutes non-expressive, proprietary commercial exploitation rather than speech in connection with a public issue; (b) even if the Court were to find that some aspect of Defendants' conduct touches on protected activity, each claim satisfies the probability-of-prevailing standard under 425.16(b)(1) through the factual showing and sworn statements set forth herein; and (c) each Defendant is a person "primarily engaged in the business of selling or leasing goods or services" and the claims arise from their commercial statements and conduct promoting and securing sales of Avatar products, such that the commercial speech exemption of Cal. Code Civ. Proc. § 425.17(c) applies and bars any anti-SLAPP motion.

## III.    JURISDICTION AND VENUE

8. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the laws of the United States, including the Lanham Act, 15 U.S.C. § 1125(a). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

4

**COMPLAINT FOR DAMAGES**

9. In the alternative, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) (diversity of citizenship) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity of citizenship exists between Plaintiff and at least certain Defendants.

10. Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because: (a) Defendant James Cameron resides in this District; (b) Defendant Lightstorm Entertainment, Inc. maintains its principal place of business in this District; (c) Defendant The Walt Disney Company (including its predecessor-in-interest Twentieth Century Fox Film Corporation) maintains its principal place of business in this District; (d) a substantial part of the events and omissions giving rise to Plaintiff's claims - including the design, development, production, and commercialization of the Avatar film franchise - occurred in this District; and (e) a substantial part of the property that is the subject of this action is situated in this District.

## IV.　PARTIES

### A. Plaintiff Q'orianka Kilcher:  Indigenous Actress And Activist Whose Identity Was Exploited

11. Plaintiff Q'orianka Kilcher ("Plaintiff") is an Indigenous actress, activist, and artist of Quechua-Huachipaeri descent on her father's side and Swiss-German descent on her mother's side. From a young age, Plaintiff lived a life deeply connected to her Native heritage and the natural world. She spent her early childhood on the beaches of Oahu, Hawaii, where her family at times lived humbly in a tent following a hurricane, instilling in her a profound respect for nature and community. By age 9, her extraordinary talents emerged when she began performing as a singer on Santa Monica's 3rd Street Promenade, catching the eye of a talent agent who helped launch her career.

**COMPLAINT FOR DAMAGES**

12. At 14 years old, Plaintiff's life changed when she was cast to portray Pocahontas in Terrence Malick's 2005 film The New World (opposite Colin Farrell and Christian Bale). As a young Indigenous girl playing one of history's most famous Native women, that experience awakened her lifelong dedication to Indigenous rights, sovereignty, land and water protection, and resisting exploitative industries.

13. In the years since, Plaintiff has risen to global visibility as an actress, yet she has remained, at her core, an Indigenous activist and "warrior of light." She has been involved in countless campaigns for Indigenous justice and environmental protection, living by her upbringing that justice is a responsibility passed down through generations. In fact, Plaintiff did not own a television until age 25; instead, she spent her time reading, painting, writing poetry, and fighting for the communities that define her purpose. Her connection to her culture is not superficial – it is the guiding force in her life and career.

14. As relevant here, Plaintiff had limited familiarity with James Cameron's work before their fateful encounter. Aside from seeing Titanic at some point, she was not particularly aware of Cameron's prominence in Hollywood. She came to know Cameron not through film, but through mutual environmental activism circles, initially regarding him as an ally to Indigenous and environmental causes. Plaintiff's mother, Saskia Kilcher, is also a devoted Indigenous rights activist who raised Plaintiff to stand up to injustice wherever it appears. This family ethos set the stage for Plaintiff's shock and heartbreak upon discovering that a supposed ally like Cameron had, in fact, perpetrated the very exploitation of Indigenous identity that Plaintiff had dedicated her life to combating.

**B. Defendant James Cameron:  Iconic Filmmaker And Principal Architect Of The Misappropriation**

15. Defendant James Cameron ("Cameron") is a world-famous film director, producer, and writer, best known for blockbuster films such as Titanic and

**6**

COMPLAINT FOR DAMAGES

Avatar. He resides primarily in California and at all relevant times was the creative controlling force behind the Avatar film franchise. Cameron presents himself as a socially and environmentally conscious figure – an "avid environmentalist" who practices a vegan diet and produces nature documentaries. He has publicly aligned himself with Indigenous peoples' struggles, even lending support to causes like the fight against a hydroelectric dam in the Amazon. Through these actions and his filmmaking, Cameron often claims to champion respect for nature and Indigenous cultures. However, as this case reveals, Cameron's actual practices have involved appropriating Indigenous cultures and even an Indigenous minor's likeness for his own creative and financial commercial benefit.

16. Cameron is the creator of the Na'vi humanoid race depicted in Avatar and, rather than relying on generalized inspiration, Cameron selected and incorporated the distinctive and identifiable facial features of a specific individual into the character design, which were fixed in tangible form and converted into physical maquettes and digital models used throughout the film's production. Cameron personally sourced, sketched, directed, and approved the character designs- including the character "Neytiri"-and authorized and directed the use of that individual's identifiable facial features as a basis for Neytiri, whose appearance is at the heart of this case. Cameron personally selected Plaintiff's facial features as the basis for Neytiri's face and approved the prototype and downstream use of those features. He is being sued in both his personal capacity and in his capacity as owner/officer of the production companies involved in Avatar.

**C. Defendant Lightstorm Entertainment, Inc.: Cameron's Production Company And Instrument Of Misappropriation**

17. Defendant Lightstorm Entertainment, Inc. ("Lightstorm") is James Cameron's production company (based in California) that developed and produced Avatar. Lightstorm and its employees, at Cameron's direction, participated in the design

7

COMPLAINT FOR DAMAGES

and creation of the Neytiri character model. They obtained and used reference images of Plaintiff without permission and integrated Plaintiff's likeness into the film's visual effects pipeline. Lightstorm is sued for its direct wrongdoing and vicarious liability in the acts described herein.

18. Defendant Twentieth Century Fox Film Corporation:  Original Studio That Financed, Distributed, And Profited From The Misappropriation

19. Defendant Twentieth Century Fox Film Corporation ("Fox") (now part of The Walt Disney Company) was the studio that originally funded and distributed Avatar (2009). Fox is a Delaware corporation with its principal place of business in California. Through its employees and agents, Fox knew or should have known of the sources used in Avatar's development. Fox capitalized on the misappropriated design and profited enormously from Avatar's success. It is sued for its role in financing and distributing the film that exploited Plaintiff's likeness.

**D. Defendant Walt Disney Company (Including Disney Enterprises, Inc.):  Successor-In-Interest That Continued And Expanded The Exploitation Through Sequels**

20. Defendant Walt Disney Company ("Disney") is the successor-in-interest to Fox and the current rights holder of the Avatar franchise, with a principal place of business in California. Disney continued the exploitation of Plaintiff's likeness by re-releasing Avatar and producing sequels that carry forward the misappropriated Neytiri character design. Disney is sued as a successor and for its ongoing use of Plaintiff's likeness in derivative works (e.g., Avatar: The Way of Water and planned sequels).

**E. Defendant Avatar Alliance Foundation**

21. Defendant Avatar Alliance Foundation is believed to be a California entity associated with Cameron and the Avatar franchise's outreach or environmental initiatives. Its exact form is currently unconfirmed, but it is included as a

8

**COMPLAINT FOR DAMAGES**

Defendant due to its potential involvement or benefit from the Avatar intellectual property, including any uses of Plaintiff's likeness in promotional or charitable contexts tied to Avatar.

**F. Defendant Stan Winston Studios, LLC ("Stan Winston Studios")**

22. Stan Winston Studios is, on information and belief, a California-based practical effects and character design studio founded by the late Stan Winston, operating through its principals and successors, including John Rosengrant and other key personnel. Stan Winston Studios was engaged by Lightstorm Entertainment to design, sculpt, and produce the physical character maquettes and sculptural busts used in the development of the Na'vi character Neytiri. As alleged herein, those maquettes were created by reference to multiple photographs of Plaintiff and under the direct supervision and approval of Defendant Cameron. Stan Winston Studios thereby participated directly in the unauthorized replication of Plaintiff's biometric facial likeness in tangible sculptural form, which was thereafter scanned and distributed as a digital production asset throughout the Avatar pipeline. Stan Winston Studios is sued for its direct wrongdoing and for its participation in the scheme of misappropriation described herein.

**G. Defendant Gentle Giant Studios, Inc. ("Gentle Giant")**

23. Gentle Giant is, on information and belief, a California corporation specializing in high-resolution three-dimensional laser scanning, digital modeling, and collectible fabrication. Gentle Giant was retained by Lightstorm Entertainment to perform high-resolution 3D laser scanning of the physical Neytiri maquette sculpted by Stan Winston Studios. As alleged herein, the resulting digital scan — derived from a sculptural model built from Plaintiff's facial features — was then transferred into a digital character model that was cleaned up and deployed as a foundational asset across the Avatar visual effects pipeline. By performing this scanning work, Gentle Giant transformed Plaintiff's biometric likeness from a physical form into a persistent, reproducible digital asset capable of distribution

9

to multiple third-party vendors. Gentle Giant is sued for its direct participation in the unauthorized digitization and commercial deployment of Plaintiff's likeness.

## H. Defendant Weta Digital Limited ("Weta Digital")

24. Weta Digital is, on information and belief, a New Zealand visual effects company that served as a primary visual effects vendor on the Avatar film franchise. Weta Digital received the digital Neytiri character model — derived from the laser scan of the maquette built from Plaintiff's facial features — and used that model as a foundational production asset to develop, texture, animate, and render the final CGI depiction of Neytiri across the Avatar films. Weta Digital's work directly propagated Plaintiff's biometric facial likeness through the downstream visual effects pipeline and into the final commercially distributed films. Weta Digital is sued for its participation in the unauthorized commercial use and exploitation of Plaintiff's likeness as a production asset.

## I.  Defendant Industrial Light & Magic ("ILM")

25. ILM, a division of Lucasfilm Ltd. LLC, is, on information and belief, a California-based visual effects company that contributed visual effects services to the Avatar franchise. ILM received and worked off digital character models derived from the Neytiri maquette — which was itself built from Plaintiff's facial features — and contributed to the texturing, finishing, and rendering of the Neytiri character in the final commercially distributed films. To the extent ILM received, stored, processed, or reproduced digital assets incorporating Plaintiff's biometric facial likeness as part of the Avatar production pipeline, ILM participated in the unauthorized commercial use of Plaintiff's likeness. ILM is sued for its participation in that pipeline and for any assets incorporating Plaintiff's likeness that remain in its possession or control

**10**

**COMPLAINT FOR DAMAGES**

**J. Lightstorm Entertainment, Inc. as Central Coordinating Intermediary**

26. As alleged throughout this Complaint, Defendant Lightstorm Entertainment, Inc. served as the central coordinating intermediary between Defendant Cameron and each of the vendor Defendants identified above. Lightstorm sourced, retained, and directed each vendor; transmitted reference photographs and design assets incorporating Plaintiff's likeness to those vendors; received and approved the outputs of each stage of the pipeline; and maintained custody of the master digital assets derived from Plaintiff's facial features across the duration of the Avatar franchise. Each vendor Defendant acted as agent, contractor, and/or joint venturer of Lightstorm and Cameron with respect to the work performed on the Neytiri character design. Lightstorm's role as the connective hub of this pipeline renders it vicariously liable for the acts of each vendor, and renders each vendor jointly and severally liable with Lightstorm and Cameron for the misappropriation described herein.

**K. Alter Ego Liability And Agency Relationships**

**1. Alter Ego Liability**

27. At all times mentioned herein, each of the corporate Defendants was the alter ego, agent, joint venturer, and/or co-conspirator of each of the other Defendants, and the acts or omissions alleged herein were performed with the knowledge, permission, authorization, ratification, and/or subsequent approval of each Defendant.

28. The corporate form of Defendants Lightstorm Entertainment, Inc., Twentieth Century Fox Film Corporation, The Walt Disney Company (including Disney Enterprises, Inc.), and Avatar Alliance Foundation should be disregarded, and each should be deemed the alter ego of the other corporate Defendants and of Defendant James Cameron individually, because there exists and existed at all relevant times such a unity of interest and ownership between the corporate

11

**COMPLAINT FOR DAMAGES**

Defendants and Defendant Cameron that the separate personalities of the corporations and the individual no longer exist, including but not limited to:

a. Defendant Cameron exercised complete domination and control over the corporate Defendants with respect to the transactions at issue in this Complaint;

b. Defendant Cameron was the decision-maker, director, and guiding force behind the misappropriation of Plaintiff's likeness, and the corporate entities were merely instrumentalities through which he acted;

c. Lightstorm Entertainment, Inc. is owned and controlled by Defendant Cameron and serves primarily as his production vehicle, with inadequate separation between Cameron's personal interests and the corporation's operations;

d. The corporate Defendants commingled assets, personnel, and decision-making authority with respect to the Avatar project such that they operated as a single enterprise rather than separate entities;

e. Corporate formalities were disregarded in the design, development, production, and exploitation of Plaintiff's likeness, with decisions flowing directly from Cameron without meaningful corporate oversight or independence;

f. The corporate Defendants were inadequately capitalized for the risk undertaken in misappropriating Plaintiff's likeness without consent, relying instead on Cameron's personal direction and the backing of larger studio entities; and

g. The corporate Defendants failed to maintain arm's-length dealings with respect to the wrongful conduct alleged herein.

29. All the above Defendants - James Cameron, Lightstorm Entertainment, Inc., Twentieth Century Fox Film Corporation, The Walt Disney Company, Avatar Alliance Foundation, Stan Winston Studios, LLC, Gentle Giant Studios, Inc.,

12

**COMPLAINT FOR DAMAGES**

Weta Digital Limited, Industrial Light & Magic, and Does 1 through 25 - are referred to collectively as "Defendants." Each Defendant, acting in concert or individually, contributed to and/or benefited from the unauthorized use of Plaintiff's likeness and the appropriation of Indigenous cultural elements described below:

a. Allowing Defendant Cameron to hide behind the corporate form of Lightstorm and other entities to escape personal liability for his intentional, malicious misappropriation of a minor's likeness would sanction fraud and promote injustice;

b. Permitting the corporate Defendants to shield their enormous profits from Avatar behind separate corporate structures while denying Plaintiff compensation would lead to a grossly inequitable result;

c. Defendants used the corporate form to facilitate, conceal, and perpetuate the wrongful taking of Plaintiff's identity, and to evade accountability for violations of her fundamental rights; and

d. The interrelated corporate structure was used as a subterfuge to avoid legal obligations to obtain consent and provide compensation for the use of Plaintiff's likeness.

### 2.  Agency And Joint Venture

30. At all times relevant herein, each Defendant was acting as the agent, servant, employee, joint venturer, partner, alter ego, and/or representative of each of the other Defendants, and was acting within the course and scope of said agency, employment, joint venture, partnership, or representation. Each Defendant gave advance authorization to, ratified, and/or approved the acts and conduct of the other Defendants as alleged herein. Each Defendant is therefore liable for the acts and omissions of the other Defendants under principles of respondeat superior, agency, joint venture, conspiracy, and concerted action.

13

**COMPLAINT FOR DAMAGES**

### 3.  Cameron As Agent Of Corporate Defendants

31. Defendant James Cameron, as the director, producer, owner, officer, and/or principal of Lightstorm Entertainment, Inc., and as the creative force contracted by Twentieth Century Fox Film Corporation and later The Walt Disney Company, acted as the agent of those corporate Defendants with full authority to make decisions regarding the Avatar project, including decisions to misappropriate Plaintiff's likeness. All acts by Cameron described in this Complaint were performed within the scope of his actual or ostensible authority as agent of the corporate Defendants, and those entities are therefore vicariously liable for his conduct.

### 4.  Lightstorm As Instrumentality Of Cameron

32. Lightstorm Entertainment, Inc. acted at all times as the instrumentality, alter ego, and agent of Defendant James Cameron in the development, production, and exploitation of Avatar. Lightstorm had no independent will separate from Cameron's personal direction and control. Any acts by Lightstorm employees or representatives were authorized by, directed by, and/or ratified by Cameron, making him personally liable for the corporation's conduct.

### 5.  Fox As Principal/Joint Venturer

33. Twentieth Century Fox Film Corporation acted as principal, joint venturer, and/or partner with Cameron and Lightstorm in the creation and distribution of Avatar. Fox financed, facilitated, and profited from the misappropriation of Plaintiff's likeness. Fox exercised supervisory control over the Avatar project, approved key creative decisions (or had the authority to do so), and distributed the film containing Plaintiff's unauthorized likeness. Fox is therefore directly and vicariously liable for the wrongful acts of its agents Cameron and Lightstorm.

### 6.  Disney As Successor And Continuing Wrongdoer

34. The Walt Disney Company and Disney Enterprises, Inc. acquired Twentieth Century Fox and thereby became the successor-in-interest to Fox's liability.

14

COMPLAINT FOR DAMAGES

Disney has continued the exploitation of Plaintiff's likeness through re-releases, sequels, merchandise, and other uses of the Avatar property. Disney acted as principal, joint venturer, and/or controlling entity with respect to the continued misappropriation after its acquisition of the Avatar franchise. Disney had actual or constructive knowledge of the prior wrongful conduct and ratified it by continuing to profit from Plaintiff's likeness without consent or compensation.

35. Concerted Action And Conspiracy Between Defendants

36. All Defendants acted in concert pursuant to a common plan or design to misappropriate Plaintiff's likeness, conceal that misappropriation from Plaintiff and the public, and profit from the unauthorized use while denying Plaintiff credit and compensation. Each Defendant knowingly participated in, substantially assisted, or encouraged the wrongful conduct of the other Defendants. This concerted action makes each Defendant jointly and severally liable for all damages caused by the overall scheme.

## 7. Ratification Of Wrongful Activity

37. To the extent any Defendant may claim that specific wrongful acts were not authorized in advance, Plaintiff alleges that each Defendant, with full knowledge of the wrongful nature of the conduct, ratified and adopted the acts of the other Defendants by:

- Continuing to distribute and profit from Avatar and its sequels containing Plaintiff's misappropriated likeness;
- Failing to correct or disavow the unauthorized use of Plaintiff's likeness after learning of it (or being charged with knowledge of it);
- Defending and perpetuating the misconduct by concealing the truth from Plaintiff;
- Accepting and retaining the financial benefits derived from the misappropriation; and

**15**

**COMPLAINT FOR DAMAGES**

- Coordinating legal, business, and public relations strategies to avoid accountability.

Such ratification renders each Defendant fully liable as if it had originally authorized the wrongful conduct.

### 8.  Joint And Several Liability

38. By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for all damages, including compensatory, statutory, and punitive damages, as well as for injunctive and other equitable relief.

*(All the above Defendants, are referred to collectively as "Defendants." Each Defendant, acting in concert or individually, contributed to and/or benefited from the unauthorized use of Plaintiff's likeness and the appropriation of Indigenous cultural elements described below.)*

### V.    STATEMENT OF FACTS

#### A.   Clear Pattern Of Misappropriating Indigenous Culture In *Avatar (2009)*

39. Avatar employs a science-fiction setting, but its humanoid characters and narrative framework are grounded in design elements sourced by Indigenous cultures, with the science-fiction elements functioning as a contextual genre setting rather than the source of those design influences. Defendants did not create the Na'vi culture out of thin air – they systematically applied references from real-world Indigenous cultures as visual and aesthetic design inputs within their data-driven pipeline, without attribution or authorization.

40. In Cameron's own words, "the European destruction of native peoples, using military force, in order to acquire their land and resources, is the obvious basis for the Avatar story."  He has openly acknowledged that colonial histories of the Americas influenced the plot of Avatar.

41. Indeed, many critics and Indigenous people have recognized Avatar as essentially a retelling of the Pocahontas story or the Lakota Sioux struggles, but repackaged

**16**

with blue Humanoids. The film's narrative centers on a white American (Jake Sully) who integrates into a Humanoid Indigenous tribe and then leads them to victory – a textbook "white savior" trope that revises history so that a settler becomes the hero of Indigenous resistance. This framing has been widely criticized for trivializing real Indigenous struggles and "erasure of the brutal realities of colonization."  Beyond the storyline, *Avatar*'s visual and cultural world-building is a patchwork of identifiable Indigenous elements:

- The visual design of the Na'vi people incorporates design references associated with Indigenous cultures. The Na'vi are depicted with long braided hair and dreadlocks – styles with deep historical significance to Black and Indigenous peoples. They decorate their bodies with traditional tribal clothing and body paint reminiscent of Native American and other Indigenous groups. In short, the Na'vi look like blue-skinned versions of Earth's native peoples and as Cameron has said in his own words, the tribe is "Humanoid."

- The weaponry and tools used by the Na'vi mirror those of real Indigenous tribes. In the film, Na'vi warriors favor bows and arrows (often with poison tips), directly reflecting armaments native to various North and South American Indigenous nations. These are not imaginative sci-fi lasers – they are the weapons of Indigenous ancestors, transplanted into an alien setting.

- The language and names of the Na'vi were constructed by linguists but explicitly draw from human languages of Indigenous origin. The Na'vi tongue contains roots and phonetics from Polynesian, African, and Native American languages. This gives the fictional language an uncanny familiarity, as it was built from the real words of many tribes.

- The spiritual beliefs and rituals of the Na'vi also parallel Indigenous practices. The Na'vi worship a nature goddess (Eywa) and treat the forest as sacred, echoing many Indigenous cosmologies. They perform chants and

**17**

**COMPLAINT FOR DAMAGES**

dances, ride animals and commune with them – practices that evoke Indigenous ceremonies (albeit in fantastical form).

42. Cameron and Defendants thus aggregated numerous distinct Indigenous design inputs into a unified, data-driven design pipeline used in the development of the film's world, which scholars note is a harmful trope portraying Indigenous peoples as a monolith. Dr. Autumn Asher BlackDeer, a Southern Cheyenne professor, observed that Avatar "falls into the pattern of media portraying Indigenous peoples as a monolith" – as if all native cultures are the same, just wearing different costumes. Furthermore, the Na'vi are idealized as "noble savages," a romanticized stereotype of Indigenous people as primitive, nature-loving innocents. While this trope may seem positive, it is inherently patronizing – portraying Indigenous people as simplistic and pure, in contrast to "civilized" people which "still inherently [places them] in a position of inferiority".

43. Most of the Avatar franchise's architects and actors are non-Indigenous (predominantly white) individuals. Casting predominantly white or non-Indigenous actors to play the Na'vi Humanoids – who are analogues for people of color – has been denounced as a form of "blueface" (a play on blackface). The term highlights how Avatar allows white actors and creators to metaphorically paint themselves in the trappings of nonwhite cultures without actually including authentic Indigenous voices.

44. As one Navajo artist and activist put it in a widely shared statement: "Our cultures were appropriated in a harmful manner to satisfy some (white) man's savior complex. No more Blueface!". Indeed, upon the release of Avatar: The Way of Water (2022), Indigenous activists across social media called for a boycott of the film, calling it "horrible & racist" for profiting off Indigenous identity and trauma. Cameron's own past comments added fuel to this outcry. In one interview, Cameron offensively speculated that if the Lakota Sioux had somehow seen their future, "they would have fought a lot harder" – a statement that

18

**COMPLAINT FOR DAMAGES**

Native leaders condemned as ignorant and racist. One Oglala Lakota lawmaker responded that Cameron's comment portrays Lakota as "ignorant savages" and ignores the fact that they did fiercely resist and continue to fight for cultural survival. This context shows that Cameron's engagement with Indigenous themes has often been tone-deaf and extractive, taking stories and imagery for his films in ways that Indigenous people find troubling.

45. In summary, Avatar's commercial success was engineered in part through Defendants' deliberate selection, retention, and deployment of specific design references within a data-driven system that was employed by Cameron to tap into audience's real emotional connection to indigenous struggles and aesthetics.

46. Cameron himself conceded the enormous debt his film owes to these cultures, writing in 2012 that the genocidal colonization of native peoples was the "obvious basis" of the story. By "pilfering" nonwhite cultures and history, James Cameron has made billions of dollars – revenue and accolades he is happy to claim as his own even as the actual sources of his inspiration remain unacknowledged and uncompensated. This pattern of cultural misappropriation sets the stage for the more personal misappropriation at issue in this lawsuit: Cameron's use of Q'orianka Kilcher's own likeness as the face of Avatar's heroine.

**B. Exploitation Of A 14-Year-Old Indigenous Girl's Likeness – The Creation Of "Neytiri"**

**1. From Creative Failure to Deliberate Appropriation**

47. Plaintiff Q'orianka Kilcher's connection to Avatar began without her knowledge in late 2005. At that time, James Cameron was deep in development on Avatar and struggling with a key creative and technical problem: the Na'vi characters, especially the female lead Neytiri, looked "too alien" to elicit empathy from audiences. Early production artwork and three-dimensional models were not working emotionally – the designs were so unfamiliar that test viewers and even Cameron himself felt little connection.

19

**COMPLAINT FOR DAMAGES**

48. Cameron recognized that if viewers could not find Neytiri appealing or relatable, "the story would never work." Cameron conceived the Na'vi as humanoids and therefore required the character of Neytiri to retain a human-recognizable facial structure and an expressive, beautiful technical quality to ensure functional expressive and aesthetic legibility.

49. At this stage of pre-casting development, Cameron selected the image of Q'orianka Kilcher as a source to form the basis of that humanoid design requirement as a facial anchor. In December 2005, Plaintiff was featured in the Los Angeles Times as part of the promotion for The New World, which was released on December 25, 2005. The newspaper printed a striking photograph of Plaintiff as Pocahontas, radiating the natural beauty and strength that had captivated audiences of that film. James Cameron saw this photograph of the 14-year-old Q'orianka and realized he had found his muse. According to Cameron's own later admissions, he "took this image of Q'orianka Kilcher from The New World" and used it as the foundation for a new Neytiri design sketch, specifically focusing on Plaintiff's facial features and incorporating them directly into his production art.

50. Cameron has openly acknowledged that "the actual source [for Neytiri's face] was a young actress named Q'orianka Kilcher . . . this is actually her, her lower face." In other words, he traced and replicated the lower half of Plaintiff's face (from just under the nose down to the chin) onto his drawing of the Humanoid character. With a high level of replication detail, Cameron converted a real indigenous teenager's visage into the face of the first Na'vi character he designed, Neytiri.

**2. Locking In a Minor's Likeness Without Consent:  Plaintiff's Facial Features Become the Immutable "Blueprint" for Neytiri**

51. Armed with this new sketch – essentially "Q'orianka in blue" – Cameron returned to his design team and distributed the drawing to the art department,

20

COMPLAINT FOR DAMAGES

explicitly instructing them to carry Q'orianka's features forward as a source input and base model in all subsequent stages of Neytiri's design. The effect was immediate. The art department, which had repeatedly been told that prior designs were coming out too strange or "too alien," now had a human reference for beauty to work from. Lead character designers and sculptors were given multiple photographs of Q'orianka along with Cameron's sketch to guide the next phases of asset creation. Lead Character Designer Jordu Schell ("Schell") later confirmed that "we were looking extensively at a photo of Q'orianka Kilcher" when shaping Neytiri. As Schell began sculpting a three-dimensional maquette - a physical bust of Neytiri guided by Plaintiff's features - Cameron rushed in to approve it, exclaiming, "That's her, don't change a thing." From that moment, the Q'orianka-based facial sculpt was "frozen" as the approved design for Neytiri. All subsequent tweaks and iterations of the character were required to preserve that core face.

52. The commercial and sexual nature of Cameron's directive was made explicit by Schell, who stated that Cameron's design requirement for Neytiri went beyond mere aesthetics: "Well, he wanted them to be very beautiful. And I do believe that, at some point, he said something to the effect of...the audience has to want to fuck her. I mean, Jim is very plain in his language." Jordu Schell, Avatar Concept Designer Reveals the Secrets of the Na'Vi, Gizmodo (Sept. 8, 2009), https://gizmodo.com/avatar-concept-designer-reveals-the-secrets-of-the-navi-5354315. This statement confirms that Cameron's selection and use of Plaintiff's facial features - those of a 14-year-old Indigenous girl - was expressly tied to a directive that the character be sexually desirable to audiences. It is against this backdrop that Defendants thereafter incorporated Plaintiff's likeness into a scene depicting sexual conduct, as further alleged herein.

53. As Lead Character Supervisor John Rosengrant explained, "We sculpt it once and it's shared between the digital and practical [teams]." Schell further described

21

the process: once the Neytiri bust was completed, "Neytiri was taken to a company called Gentle Giant that does 3D scanning and they, with a laser, scanned every aspect of this sculpture. That is then transferred into a digital model, which can then be cleaned up and used for the actual film." Thus, the physical Neytiri sculpt that Cameron approved - the one based on Plaintiff's face - was digitized into the CGI pipeline as an intellectual property asset.

54. Crucially, every artist down the line preserved Plaintiff's distinctive features. Character designer Joseph Pepe explained that even as the Neytiri design evolved, the directive was to "retain the lower part of the face… everything from the philtrum, just under the tip of the nose, to the bottom of the chin" - precisely the region of Plaintiff's face Cameron said he had copied. In other words, Neytiri's lips, chin, jawline, and overall mouth shape in the final film are Q'orianka Kilcher's. This was not a fleeting inspiration or a vague homage; it was a literal transplant of a real teenager's facial structure into a blockbuster movie character. Cameron later admitted that Q'orianka's face was the "keystone" of the design — if it were removed, "the whole look falls apart." By solving his empathic design problem in this manner, Cameron essentially appropriated an underage Indigenous girl's identity as a tool to make his blue humanoid characters more attractive and relatable to audiences.

55. All of this occurred without Plaintiff's knowledge or consent. At the time this design work was underway, Plaintiff was 14 to 15 years old, busy with high school and activism, and utterly unaware that her likeness was being dissected and replicated in a Hollywood art department. Defendants never sought permission from Plaintiff or her family and never compensated her for the use of her image. They treated the facial features of a minor as biometric source data for their commercial gain, as if they were part of the public domain rather than the personal attributes of a living child. This was not only a profound personal violation; it also likely violated child performer labor laws and privacy rights

22

**COMPLAINT FOR DAMAGES**

designed to protect minors. Defendants' conduct bypassed every safeguard meant to prevent the exploitation of a child's identity.

### 3. A Billion-Dollar Character Built On An Uncredited Indigenous Child

56. It is worth noting that Avatar's producers did not even attempt to have Plaintiff audition for the role of Neytiri, despite implementing her face in the production. In 2007, Plaintiff's talent agent at the time, Carlyne Grager, tried to get Plaintiff in the door to read for Avatar, recognizing the potential fit. But the casting office refused to even give Plaintiff an audition. Cameron and his team were content to use Plaintiff's looks behind the scenes, but they showed no interest in employing or crediting her in the film itself. The role of Neytiri ultimately went to actress Zoe Saldana, who performed the character via motion-capture. When Zoe Saldana was cast and first met Cameron, he already had a fully sculpted Neytiri figure sitting on his table – a design that "embod[ied] the decisions described above" and was essentially a sculpture of Q'orianka's face in the full actor's form.

57. Saldana walked into Cameron's office in mid-2006 and seeing this beautiful maquette of Neytiri on the coffee table, fell in love with the character at first sight.   Cameron told Zoe Saldana that no one would see her, only the essence of her since she was playing an already designed CGI character.  With the design locked in, Defendants then converted the sculpt into a high-resolution digital model used on screen.  The Neytiri maquette (built from Plaintiff's facial features) was 3D-scanned and became the basis for the CGI character. Thus, every frame of Avatar featuring Neytiri is effectively a derivative work of Plaintiff's likeness. The film's unprecedented visual realism – one of its most praised aspects – stems in part from the subtle humanity imbued by using a real person's features.

58. Cameron achieved the empathetic connection he wanted: audiences found Neytiri appealing, relatable, even attractive, without realizing they were responding to

23

the familiar facial source of a real Indigenous girl. Defendants then leveraged this success to reap enormous financial rewards. Avatar shattered box office records by earning approximately $2.92 billion worldwide, plus untold millions in merchandizing, home media, and franchise spin-offs.

59. The character of Neytiri became iconic – her image graced posters, toys, and advertisements around the globe. But nowhere was Plaintiff ever acknowledged or compensated. Defendants had appropriated Plaintiff's most personal attributes – her face, her "image" in the literal and legal sense and converted those attributes into commercial production assets and corporate property to exploit with full control.

### C. Plaintiff's Unwitting Discovery Of The Truth And Defendants' Concealment (Tolling Of The Statute Of Limitations)

#### 1. A Gift That Concealed The Truth

60. Despite Avatar's global fame, Plaintiff Q'orianka Kilcher remained unaware of her involuntary role in its creation for many years. This is a testament to how effectively Defendants' non-disclosure and concealment of Plaintiff's role within the production pipeline downplayed the nature and extent of the conduct at issue, materially delaying Plaintiff's discovery and affecting claim accrual under the applicable statutes of limitation. The timeline of Plaintiff's discovery is crucial both to explain her delayed lawsuit and to demonstrate Defendants' calculated misrepresentations, which toll any limitations defense.

61. Avatar was released in December 2009. At no point around the film's release did Defendants disclose to Plaintiff (or the public) that her likeness had been used. In fact, Plaintiff and Cameron had never even met in person during the entire production or release of Avatar. This changed by chance on March 6, 2010, when Plaintiff and Cameron both attended a Global Green environmental charity event in Hollywood. Plaintiff was 19 years old by then, but still vividly remembered her time as a 14-year-old Pocahontas and had become a visible activist.

24

COMPLAINT FOR DAMAGES

62. Cameron and Plaintiff were introduced at that event – notably, this was the first time he ever spoke to her in any form. He struck up a friendly conversation, praising her advocacy work: "I've admired your activism work in the Amazon," he told her, establishing a tone of allyship. Then he added an intriguing offer: "I have something for you." Cameron was deliberately vague about what this "something" was, but he handed Plaintiff his business card and invited her to come to his office to pick up a "surprise gift" he had prepared.

63. Shortly thereafter, Plaintiff, accompanied by her mother/manager Saskia, went to Cameron's Lightstorm office in Manhattan Beach to receive this mysterious gift. Cameron himself did not attend the meeting; instead, an assistant screened the film and presented Plaintiff with a framed artwork – specifically, what Plaintiff believed to be an original one off sketch of Avatar's character Neytiri drawn and signed by James Cameron. Attached to the sketch was a handwritten note from Cameron that read: "Your beauty was my early inspiration for Neytiri. Too bad you were shooting another movie. Next time." – signed James Cameron.

64. Plaintiff and her mother were initially confused by this note. Cameron was implying that Plaintiff had been an early inspiration for the character Neytiri, and further implying that he might have cast her ("next time") had she not been busy filming another movie.  This was perplexing.

65. No one from Cameron's team had ever reached out to Plaintiff about Avatar. The reference to her "shooting another movie" as a reason for not being involved was puzzling and false – Plaintiff had never been offered an audition or role in Avatar, and therefore could not have "missed" the opportunity due to scheduling. Cameron's note created a misleading narrative that she was simply unavailable, concealing the reality that he chose to use her likeness without contacting her at all. The notion that Plaintiff's "beauty" had inspired Neytiri was flattering yet vague. Plaintiff has received many drawings, paintings, and

**25**

**COMPLAINT FOR DAMAGES**

sketches from fans and peers over the years and had no reason to suspect any wrongdoing based on what appeared to be mutual allyship and respect.

66. Plaintiff interpreted it at face value: that Cameron had seen her somewhere (perhaps her public work or films) and artistically some inspiration somewhere along the way, since she heard he had been conceiving the film for many years. Importantly, Plaintiff did not take this to mean that her actual face had been replicated and implemented in an elaborate production pipeline for Avatar or that any actual usage of her image had actually occurred.

67. In her worldview – steeped in Indigenous spirituality – she thought Cameron might be honoring her essence or the ethos she represents. She even viewed Neytiri as a positive symbol: a "female warrior of light that fights against injustice and indigenous exploitation," qualities Plaintiff herself embodies. The gift seemed like a benevolent gesture from an esteemed elder in her activist circle, acknowledging a shared passion for protecting Indigenous communities. Given this understanding, Plaintiff felt deeply touched rather than alarmed.

68. She thanked Cameron warmly by email shortly after: "I am so, so touched by the beautiful sketch you made of Neytiri!!! ... I'm so thankful, humbled and touched that in some little way I was able to be a part of your inspiration for this important film." In that email, Plaintiff even remarked that she teared up with joy, believing that Avatar, through Neytiri, was "giving many young indigenous youth the courage to be proud of their culture . . . and hope that our voices will be heard."

69. This heartfelt response shows that Plaintiff perceived Neytiri as a separate fictional entity – a character that reflected the fight for Indigenous rights - and Cameron's use of the word "inspiration" gave her no clear notice of a legal injury. Cameron's note had "concealed and minimized the true nature" of his actions. He made it seem as if Plaintiff's influence was abstract and incidental, rather than revealing how he and his design team had commercially and systematically used

26

**COMPLAINT FOR DAMAGES**

the biometric features of her face through a pipeline of artists and technology. In reality, multiple professionals at Lightstorm and digital effects vendors had been copying and distributing Plaintiff's likeness for years – but Cameron's choice of words concealed this systemic commercial use completely.

## 2. Years Of Assurances And Strategic Silence Lulling Plaintiff Into Inaction

70. Plaintiff, having no reason to suspect wrongdoing, put the framed sketch on her wall and continued with her life, proud to have inspired Cameron in some small way. She remained friendly with Cameron in the following years, purely on the surface level of activism networking. They did not see each other often in person after 2010. There were sporadic email exchanges – usually Plaintiff inviting Cameron to attend Indigenous rights events or screenings of her independent projects, and Cameron politely declining due to being "out of town" or busy.

71. In July 2017, Plaintiff even signed a non-disclosure agreement and met with Cameron at Lightstorm about the Avatar sequels, hoping to collaborate or at least be involved (a meeting arranged through Cameron's casting office). Cameron did meet with her then, but nothing concrete materialized for her participation. Still, at no point in 2017 did Cameron reveal her past contribution – he treated the conversation as if she were just another interested actress.

72. Over the years, Plaintiff remained respectful and hopeful. She held onto Cameron's promise of "Next time" hoping she could collaborate with her activist ally.  For instance, in May 2022, as the sequel Avatar: The Way of Water was imminent, Plaintiff emailed Cameron a photograph of herself posing with the Neytiri sketch he'd given her, playfully writing: "My how time flies... Is it 'Next time' yet? I'm ready, let's go! ;)."

73. She believed perhaps Cameron truly did intend to include her in a future project. There was no reply, but shortly after, in November 2022, Plaintiff was invited as

COMPLAINT FOR DAMAGES

an Academy of Motion Pictures Arts and Sciences member, to an exclusive screening and after-party for Avatar: The Way of Water.

74. At that event, Cameron greeted Plaintiff kindly. They had a private chat where Cameron spoke about upcoming Avatar films and told Plaintiff to reach out if she needed help with any of her projects, reiterating the feeling of allyship. Cameron even commented to Plaintiff with her partner (Adam VillaSenor) nearby before taking a photo together with Cameron telling her - "This is a historic moment." Plaintiff was confused by that comment, but took it as a very nice compliment by Cameron. They even took a friendly photograph together, side by side, at the reception.

75. In January 2023, Plaintiff ran into Cameron's long-time personal assistant, who mentioned that Cameron "would like to stay in touch" and provided new contact information. All of these interactions reinforced Plaintiff's belief that Cameron respected her and that there was mutual goodwill. Crucially, Cameron never hinted that Plaintiff might have a claim or issue regarding the original film's use of her likeness. By maintaining this cordial relationship and never mentioning the true extent of Plaintiff's "inspiration" for Neytiri, Cameron effectively lulled Plaintiff into inaction well past the normal limitations period.

76. The facade of understanding finally cracked in 2024. In April 2024, a video was published online (on YouTube) showcasing a new "Tech Noir" museum exhibit in Paris celebrating James Cameron's life's work. In this exhibit, James Cameron himself gives a guided tour of his career, including the making of Avatar. For the first time in a public forum, Cameron explicitly admits the full truth about Neytiri's design.

77. In the recorded interview, Cameron points to an image of Neytiri and says unambiguously: "This is her [Q'orianka Kilcher's] lower face." He described this use of Plaintiff's face as a "keystone" of the design process, confirming that earlier designs lacked humanity and that he "used the photo of Plaintiff to build

28

empathy" for the character. Cameron even recounted meeting Plaintiff years later and presenting her with the framed sketch, effectively retelling the story of the 2010 gift but now adding the crucial context that her actual face had been used to create the character. In other words, in a moment of retrospective candor for the museum audience, Cameron revealed precisely what he had concealed from Plaintiff: that Neytiri's beauty was not merely "inspired" by Plaintiff, but was directly replicated from her facial features.

78. Plaintiff did not see this video immediately when it was posted (it was hosted on a French YouTube channel and not widely circulated at first). But a year later, in August 2025, a short clip of Cameron's Tech Noir interview began circulating on social media (TikTok, Twitter, etc.) among film fans and Indigenous activists. One such clip came to Plaintiff's attention. In that moment, Plaintiff finally learned of the betrayal Cameron had kept from her. She watched and listened as he coolly described on camera how he took her face for Neytiri and how essential it was to Avatar's success. Plaintiff was shocked, heartbroken, and felt utterly betrayed. Here was someone she admired as an ally – who spoke about protecting Indigenous cultures – openly bragging that he had done to her the very thing his villains do in Avatar: exploit and appropriate. Plaintiff describes feeling "bewildered that someone could do this to her – the very thing they preach against in their own films." The cognitive dissonance and personal hurt were overwhelming.

79. Immediately, Plaintiff and her team began investigating further evidence to corroborate Cameron's admissions. In August and September 2025, Plaintiff dove into archival Avatar materials – things she previously had no reason to scrutinize. She uncovered, among other things:

80. Behind-the-scenes footage from the production of Avatar (included in a 2023 Blu-ray re-release with 3 hours of special features) that actually showed the original Neytiri sketch and design process. In this footage, there were shots of sculpture

29

**COMPLAINT FOR DAMAGES**

busts and maquettes with Plaintiff's likeness and discussions of how those were digitized and provided to multiple vendors as the base for the character. Plaintiff noticed her own facial likeness being used in these materials, yet her name was conspicuously omitted from any commentary or captions

81. The official book Avatar: The Art of the Movie (circa 2009), which featured production art including the Neytiri sketch drawn from her photo – again with no credit given to her as the reference. There was even a piece of concept art replicating a photograph of Q'orianka from The New World, with her skin color changed to blue.

82. Statements from Avatar crew interviews. For example, Lead Character Designer and sculptor Jordu Schell's past comments confirmed he worked off "Cameron's Neytiri sketch of Q'orianka and also multiple photos of Q'orianka" to create the sculpture maquettes under Cameron's direction – which would then be digitized in high resolution. Schell also stated that when he later saw the final trailer of the film, "it looks just like what he did on the maquette using her anatomical structure and likeness." Similarly, Character Design Supervisor John Rosengrant mentioned in an Avatar behind-the-scenes featurette that "we would incorporate the actor into the design," referring to how they infuse an actor's features into CG characters – a veiled reference that only now made sense as pointing to Plaintiff.

83. Cameron's own recently published art book Tech Noir (a 2022 retrospective) included storyboards and sketches from his career. There, Plaintiff found Cameron's Neytiri sketch and notes indicating he had used a particular face as reference. In a 2022 Total Film magazine interview, Cameron also explicitly admitted using "her face" to design Neytiri, something Plaintiff was unaware of until she searched for it.

84. Instructional training video materials from the Stan Winston School of Character Arts, including the course Hybrid Characters: Blending Practical & Digital FX taught by Avatar's Lead Character Supervisor John Rosengrant, further

30

COMPLAINT FOR DAMAGES

illustrate the production methodology actually used in Avatar. As reflected in the course visuals and diagrams, early character design begins with specific source references and design sketches, which are resolved into clay sculptural busts and maquettes to establish facial anatomy and proportion. These physical sculptures are then digitized and used as the foundational basis for downstream digital character assets distributed to multiple visual-effects vendors. The course materials depict a sequential workflow directly from Avatar and the character Neytiri - displayed is Cameron's sketch to Jordu Schell's sculpture to digital implementation - demonstrating that the approved Neytiri sculpture maquettes function as upstream consistency assets that preserve facial geometry through successive stages of production to the final rendition.

85. All of this evidence, gathered in late 2025, painted a jarring picture: For 18 years (since 2005), Defendants had commercially exploited Plaintiff's likeness in developing and continuing the Avatar franchise, and had systematically avoided alerting or crediting her. Every new piece of information reinforced how deliberate the cover-up was.

86. Cameron's note in 2010 was not an innocent compliment – it was a calculated half-truth. By saying "your beauty was my early inspiration" instead of "I based the character's face on you," and by suggesting she was simply unavailable for the role (the "shooting another movie" lie), Cameron kept Plaintiff oblivious while also assuaging any potential curiosity or claim she might raise. Plaintiff, as a young artist and activist, took him at his word and even felt gratitude. It wasn't until Cameron grew confident enough to tout his methods publicly (in 2024) that the full truth slipped out – and only through chance did Plaintiff see it in 2025. In short, Defendants managed to reap the benefits of their misappropriation for nearly two decades while keeping Plaintiff in the dark.

87. Given the foregoing, any statute of limitations that might ordinarily apply - given that Avatar was released in 2009 - is no obstacle here. Under the discovery rule,

31

COMPLAINT FOR DAMAGES

a cause of action does not accrue until the plaintiff discovers, or reasonably should have discovered, the facts constituting the claim. Plaintiff did not discover Defendants' misappropriation until August 2025 at the earliest, when she viewed Cameron's admission in the Tech Noir video.

88. Before that, Plaintiff neither knew nor could have known despite reasonable diligence – indeed, Defendants actively obscured those facts. Cameron's own actions created a false sense of security: by giving Plaintiff a gift and praise in 2010, he disarmed any suspicion. This constitutes fraudulent concealment, which equitably tolls the statute of limitations.

89. Cameron had a duty, at the very least, to be honest once he chose to broach the topic in 2010.  Instead, he spoke in riddles that hid the truth, and Plaintiff relied on those reassurances to believe nothing was wrong. Defendants also continued to reuse Plaintiff's likeness in new ways (e.g., the 2022 re-release of Avatar and ongoing sequels), meaning the wrongful conduct is continuing or was at least renewed within the limitations period.

90. Finally, because Plaintiff was a minor (14 to 15 years old) at the time of the initial misappropriation in 2005, any applicable statute was tolled during her minority by operation of law. She reached adulthood in 2008 but even then lacked knowledge of the claim. In sum, Defendants cannot hide behind a limitations defense of their own making. The timeline of discovery justifies tolling under both the discovery rule and the fraudulent concealment doctrine, allowing Plaintiff's claims to proceed on their merits.

## D.  Defendants' Use Was Not "Transformative" – It Was Theft Disguised As Art (First Amendment Defense Does Not Apply)

91. Anticipating that Defendants may invoke California's anti-SLAPP statute (Cal. Code Civ. Proc.  425.16) and/or the First Amendment, Plaintiff addresses here why (A) the conduct giving rise to each claim does not constitute "protected activity" under Cal. Code Civ. Proc.  425.16, and (B) even if the Court were to

32

reach the second prong, Defendants' use of her likeness is not protected "transformative use" under California right-of-publicity law.

### 1. The Claims Do Not Arise From "Protected Activity" Under Cal. Code Civ. Proc. § 425.16

92. California's anti-SLAPP statute protects acts "in furtherance of the person's right of petition or free speech... in connection with a public issue." Cal. Code Civ. Proc. § 425.16(b)(1). The statute is not a shield for every act that is connected to the production of a motion picture. As the California Supreme Court made clear in *Park v. Bd. of Trs. of California State Univ.*, 2 Cal. 5th 1057, 1060, 393 P.3d 905 (2017), a claim is subject to an anti-SLAPP motion only if the protected activity is "the wrong complained of" - not merely incidental to the wrong. Here, the wrong complained of in each count is not a statement, publication, or act of creative expression. It is a series of commercial acts: (1) the unauthorized extraction of a minor's facial biometrics from a published photograph; (2) the deliberate replication of those biometrics in two-dimensional production sketches and three-dimensional sculptural maquettes distributed to an art department as functional production data; (3) the high-resolution digital scanning of those maquettes into Defendants' visual effects pipeline; (4) the distribution of the resulting digital assets to multiple third-party vendors for consistency across downstream character production; and (5) the commercial exploitation of the resulting character - modeled on Plaintiff's face - across billions of dollars of theatrical, home video, merchandise, and promotional revenue. None of these acts is a protected "statement" or act of "free speech." Each is a commercial act of appropriation, analogous to taking a person's photograph and selling it for advertising without consent. That such acts occurred in the context of filmmaking does not transform them into protected speech. See *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 576, 97 S. Ct. 2849, 53 L. Ed. 2d 965

**COMPLAINT FOR DAMAGES**

(1977) (the First Amendment does not immunize the unauthorized appropriation of a performer's identity just because it is embedded in an expressive work).

93. Moreover, Defendants are entities and an individual who are all primarily engaged in the business of selling entertainment goods and services - motion pictures, home video, merchandise, streaming, and theme park attractions. The claims here arise from their commercial statements and conduct made for the purpose of promoting and securing the sale of Avatar products. Accordingly, the commercial speech exemption of Cal. Code Civ. Proc. § 425.17(c) applies and independently bars any anti-SLAPP motion directed at these claims.

### 2. Even Assuming Protected Activity Is Found, Defendants' Use Is Not Transformative

94. Although Avatar may be an expressive work, Defendants' use of Plaintiff's likeness involved the unlicensed incorporation of Plaintiff's facial features as functional anatomical data inputs within the character-design pipeline for humanoid characters - conduct that falls outside the scope of legally protected transformative use, as further detailed below.

95. California's "transformative use" test (developed in right-of-publicity law and informed by federal copyright principles) asks whether the challenged work merely appropriates the original likeness or instead adds significant creative elements such that it becomes something more than a literal depiction of the person. See *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 404–05, 21 P.3d 797 (2001). When the defendant's skill and creativity are "manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to commercially exploit his or her fame," the use is not transformative and is not protected by the First Amendment. *Comedy III Productions, Inc.*, 25 Cal. 4th at 405.

34

**COMPLAINT FOR DAMAGES**

### 3. Preservation, Not Transformation: Defendants Copied Plaintiff's Face Rather Than Altering It

96. Defendants did not meaningfully transform Plaintiff's likeness into something new or unrecognizable.  To the contrary, they incorporated her distinctive facial features, anatomical structure, and unique biometric details, essentially intact, into the Neytiri character's design. As alleged above, Cameron insisted on keeping Plaintiff's entire lower face intact in the final design of Neytiri. The character's lips, chin, and jaw were not abstracted, exaggerated, or reimagined – they were copied. This is the opposite of transformation; it is direct duplication under a cosmetic disguise (blue skin and other alien ornamentation) that still leaves Plaintiff's identity as the material foundation of the character.

97. The California Supreme Court in *Comedy III Productions, Inc.*, 25 Cal. 4th 387 held that even a skilled artistic rendering of celebrities was not protected where the work was essentially a literal depiction designed to capitalize on the celebrity's identity. *Comedy III Productions, Inc.*, 25 Cal. 4th at 405–06. Here, Defendants' use goes even further: instead of merely drawing Plaintiff's face, they digitally replicated it and scanned it in high resolution to distribute to other vendors for consistency across the design pipeline. '

98. Defendants didn't just create a portrait of Plaintiff — they embedded a part of Plaintiff herself (her unique facial geometry) into their production assets. The test is not whether Defendants added fictional elements around Plaintiff's likeness, but whether Plaintiff's likeness itself was transformed. See *No Doubt v. Activision Publ'g, Inc.*, 192 Cal. App. 4th 1018, 1034, 122 Cal. Rptr. 3d 397 (2011) (the proper inquiry is whether the depiction of the person is transformed, not whether other creative elements are present). Here, Plaintiff's likeness was not transformed in any significant way. Cameron himself acknowledged that traditional sculpting was used to imagine the creatures and that "Neytiri and all of the other Na'vi characters were all created in clay before they went into 3D

35

COMPLAINT FOR DAMAGES

CG" – confirming that Plaintiff's core identity was preserved rather than transformed in the final digital character. When the "essence" of the person remains the same, the use fails the transformative use test as a matter of law. *Comedy III Productions, Inc.*, 25 Cal. 4th at 406.

### 4. Commercial Exploitation, Not Protected Expression: Plaintiff's Likeness Was Used To Sell A Product, Not To Convey A Unique Message

99. Defendants' use of Plaintiff's likeness was not commentary, parody, or any sort of protected expressive speech about Plaintiff. Neytiri was not a statement about Q'orianka Kilcher; the character was not a parody of her, nor part of a biographical or newsworthy work about her. Instead, Defendants utilized Plaintiff's facial features as functional data in a character design, using those features to establish the look of a fictional being and to generate downstream production assets that made the character appealing, emotionally resonant, and beautiful – all to enhance a commercial entertainment product. This is the paradigmatic commercial exploitation of identity that the right of publicity exists to prevent.

100. California courts have consistently held that when a likeness is used primarily for commercial gain rather than any expressive comment on the person, the right of publicity prevails over First Amendment concerns. For example, the Ninth Circuit in *Midler v. Ford Motor Co.*, 849 F.2d 460, 462–63 (9th Cir. 1988), held that using a celebrity's distinctive voice in a car commercial without her consent violated California's common law right of publicity. Consistent with that holding, courts have recognized that where a defendant's appropriation of identity serves no purpose other than to exploit the individual for commercial advantage, no First Amendment immunity arises. *Midler*, 849 F.2d at 463. Here, Defendants' appropriation of Plaintiff's likeness served no purpose other than to exploit her identity for their own commercial benefit.

36

101.   The fact that Defendants' work is a motion picture does not automatically shield every component of that work from right-of-publicity liability. In *Zacchini*, 433 U.S. at 576–78, the U.S. Supreme Court held that the First Amendment does not protect the unauthorized commercial appropriation of a performer's act, even when embedded within an expressive medium. The Constitution does not permit a defendant to take "the very thing" of value for which a person is known and exploit it without consent. *Zacchini*, 433 U.S. at 576. Here, Defendants appropriated the very thing that gave Neytiri her realism and emotional power: Plaintiff's face. That appropriation served the same purpose in the film as Plaintiff's image would serve in reality — to convey her distinctive appearance to an audience, only now in a massively profitable commercial film.

102.   Federal copyright law reinforces this conclusion. In *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 143 S. Ct. 1258, 215 L. Ed. 2d 473 (2023), the U.S. Supreme Court emphasized that a work is not transformative merely because it has a different aesthetic or medium. *Andy Warhol Foundation for the Visual Arts, Inc.*, 143 S. Ct. at 1275–76. Where the secondary use shares the same essential purpose as the original, claims of new meaning or artistic style do not suffice. *Andy Warhol Foundation for the Visual Arts, Inc.*, 143 S. Ct. at 1275. Defendants' use of Plaintiff's likeness served the same essential purpose as the original image: to depict Plaintiff's face to an audience. Changing the medium from photograph to CGI did not transform that purpose at all as defendant's goal was to create CGI characters as photorealistic alongside live-action humans.

   **E.   A Digital Clone Hidden Behind CGI: "Transformative Use" Is A Post Hoc Justification For Theft**

103.   Courts have squarely rejected the argument that placing a person's likeness in a fictional or fantastical context renders the use transformative. In *No Doubt*, 192 Cal. App. 4th 1018, the court held that placing realistic avatars of band

37

members into fictional videogame settings did not transform their likenesses, even though the surrounding context was imaginative. *No Doubt*, 192 Cal. App. 4th at 1034–35. The avatars remained "literal recreations" of the plaintiffs, and the added fanciful elements were legally irrelevant. *No Doubt*, 192 Cal. App. 4th at 1034. The same reasoning applies here.

104.    Changing Plaintiff's skin color, enlarging her eyes, or situating her face in a science-fiction narrative does not alter the fact that Neytiri's face was built around Plaintiff's real, identifiable facial structure and distinct features. Minor cosmetic changes do not negate misappropriation. See *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1398–99 (9th Cir. 1992), *as amended* (Aug. 19, 1992) (right of publicity is not limited to literal depictions; it also protects against appropriation of identity in altered forms). Nor does it matter that the general public may not have immediately recognized Plaintiff's face. The law does not require that the person be famous or recognizable to everyone at the time of exploitation. What matters is that Defendants knowingly appropriated Plaintiff's identity for their own advantage. *Midler*, 849 F.2d at 463. Concealing the source of the likeness behind CGI does not excuse the theft; it merely makes it harder to detect.

105.    In substance, Defendants did not create a character merely inspired by Plaintiff; they created a digital clone of part of Plaintiff's face and embedded it in a profitable franchise. Allowing Defendants to invoke a "transformative use" defense under these facts would effectively eliminate the right of publicity in the digital age, granting studios a free license to copy real human faces so long as they add enough computer-generated camouflage. That is not the law. California's transformative use doctrine, federal copyright principles, and the First Amendment all draw a clear boundary between protected expression and commercial exploitation. Defendants crossed that boundary. Plaintiff's likeness

38

**COMPLAINT FOR DAMAGES**

was not transformed; it was taken - without her knowledge, without her consent, and without compensation.

## VI.   CLAIMS FOR RELIEF

106.   Each count set forth below arises from Defendants' commercial conduct - the non-consensual extraction, replication, digitization, and systematic commercial exploitation of Plaintiff's biometric facial likeness as production data - and not from any protected act of free speech or creative expression. To the extent Defendants contend that the creation or distribution of a motion picture constitutes "protected activity" under California Code of Civil Procedure § 425.16, each count independently satisfies the probability-of-prevailing standard under section 425.16(b)(1) through the factual showing, documentary evidence, and sworn statements described herein.

107.   Plaintiff has in her possession, among other admissible evidence: (i) Cameron's own recorded public admissions from the Tech Noir museum exhibit (2024) identifying Plaintiff as the facial source for Neytiri; (ii) the original Cameron-signed handwritten note delivered to Plaintiff in 2010; (iii) corroborating statements by Lightstorm lead character designer Jordu Schell and character supervisor John Rosengrant confirming the use of Plaintiff's photographs in sculpting the Neytiri maquette at Stan Winston Studios; (iv) records of Gentle Giant's high-resolution laser scanning of the maquette and delivery of the resulting digital model into the production pipeline; (v) the Neytiri design sketches and maquette images published in Avatar: The Art of the Movie (2009) and Cameron's Tech Noir art book (2022); (vi) behind-the-scenes production footage included in the 2023 Blu-ray re-release depicting Plaintiff's likeness in the design pipeline; (vii) Stan Winston School instructional materials depicting the precise character design workflow used on Avatar, from sketch through maquette to digital implementation; and (viii) evidence of downstream distribution of digital assets derived from Plaintiff's likeness to vendor

Defendants including Weta Digital and Industrial Light & Magic. This evidence is sufficient to establish a prima facie case on each count as a matter of law.

## COUNT I

### False Endorsement and False Designation of Origin

### (Against All Defendants)

### (Lanham Act, 15 U.S.C. § 1125(a)(1)(A))

108.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein. This Count arises from Defendants' commercial conduct - the unauthorized use of Plaintiff's likeness in commerce to sell Avatar products - and not from any protected expressive activity. The probability of prevailing on this Count is established by Cameron's own recorded admissions, the corroborating statements of Lightstorm artists, the published production art directly reflecting Plaintiff's facial features, and the continuing commercial distribution of the Neytiri character in interstate and foreign commerce without Plaintiff's consent.

109.    The Lanham Act, 15 U.S.C. § 1125(a)(1)(A), creates a federal cause of action against any person who, on or in connection with any goods or services, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of goods, services, or commercial activities by another person.

110.    Plaintiff Q'orianka Kilcher is a professional actress and Indigenous activist of national and international recognition. Her distinctive likeness-including her unique facial features, proportions, and biometric characteristics-constitutes a protectable identity interest and commercial asset under the Lanham Act. Plaintiff's name and likeness carry significant commercial value and are associated in the minds of consumers and industry participants with her identity,

40

reputation, and brand, particularly in the entertainment industry and Indigenous advocacy communities.

111. Defendants, in producing, distributing, promoting, licensing, and commercializing the Avatar film franchise, used Plaintiff's likeness in interstate and foreign commerce by incorporating her distinctive facial features into the character Neytiri-the central protagonist of the Avatar franchise-and distributing that character in theatrical releases, home video and streaming media, merchandise, theme park attractions, promotional and advertising materials, and other commercial contexts, all in interstate and foreign commerce within the meaning of 15 U.S.C. § 1127.

112. Defendants' unauthorized use of Plaintiff's likeness in connection with the Avatar franchise is likely to cause confusion, to cause mistake, and to deceive consumers and the public as to whether Plaintiff sponsored, endorsed, approved of, or was affiliated or associated with the Avatar franchise. Specifically, upon learning that Plaintiff's actual facial likeness served as the literal design foundation for Neytiri, consumers and industry professionals are likely to be confused as to whether Plaintiff participated in, authorized, or consented to the use of her likeness-including in the sexually explicit depictions involving the Neytiri character-or whether she endorsed, was compensated by, or was otherwise affiliated with the franchise. This confusion is materially heightened by James Cameron's own public admissions-made without Plaintiff's knowledge, authorization, or consent-that he used Plaintiff's face as the "keystone" of Neytiri's design, creating a retroactive public association between Plaintiff and the Avatar franchise that she never agreed to.

113. Defendants' conduct constitutes a false endorsement in violation of 15 U.S.C. § 1125(a)(1)(A) in that it misrepresents to the public that Plaintiff sponsored, endorsed, or approved of the Avatar franchise and its depictions, when in truth

41

**COMPLAINT FOR DAMAGES**

Plaintiff had no knowledge of, and never consented to, any such use or association.

114.    Defendants' false endorsement and false designation of origin were willful, intentional, and in bad faith. Cameron and the other Defendants knowingly used Plaintiff's likeness without her consent, deliberately concealed her contribution to avoid compensation and liability, and actively deceived Plaintiff with false assurances to forestall any challenge. This willful conduct entitles Plaintiff to enhanced damages under 15 U.S.C. § 1117(a).

115.    As a direct and proximate result of Defendants' violations of 15 U.S.C. 1125(a), Plaintiff has suffered actual damages including, without limitation: (a) the fair market value of the endorsement, licensing, or appearance fee she would have commanded for the commercial use of her likeness in connection with the Avatar franchise; (b) lost income and career opportunities resulting from her exclusion from the franchise and the suppression of her public association with Neytiri; (c) harm to her reputation, goodwill, and professional standing in the entertainment industry; and (d) disgorgeable profits earned by Defendants attributable to the false endorsement and unauthorized use of Plaintiff's likeness.

116.    Pursuant to 15 U.S.C. § 1117(a), Plaintiff seeks an award of the following monetary relief:

    a) Defendants' Profits: An award of all profits earned by Defendants that are attributable to the false endorsement and unauthorized use of Plaintiff's likeness in commerce, including but not limited to profits derived from theatrical releases, home video and streaming distribution, merchandise, licensing, theme park attractions, and advertising revenues related to the Avatar franchise. Plaintiff is entitled to an accounting of Defendants' gross revenues derived from the Avatar franchise, and Defendants shall bear the burden of proving any deductions or apportionment;

COMPLAINT FOR DAMAGES

b) Actual Damages: All actual damages sustained by Plaintiff as a proximate result of Defendants' violations, including the fair market value of the endorsement or licensing fee Plaintiff would have commanded for the commercial use of her likeness, lost income and career opportunities, and harm to her reputation and goodwill;

c) Treble Damages: Because Defendants' violations were willful and deliberate-as evidenced by their knowing misappropriation, sustained concealment, and deliberate deception of Plaintiff over a period of nearly two decades-Plaintiff seeks an award of up to three times the amount of actual damages and/or profits found by the trier of fact, pursuant to 15 U.S.C. § 1117(a);

d) Prejudgment Interest: An award of prejudgment interest on all sums found to be owed, from the date of first infringement to the date of judgment, to compensate Plaintiff for the time value of the monies wrongfully withheld by Defendants;

e) Attorney's Fees and Costs: An award of reasonable attorney's fees and the costs of this action, as this constitutes an "exceptional case" within the meaning of 15 U.S.C. § 1117(a), given Defendants' willful, bad-faith conduct and deliberate concealment;

f) Statutory Damages (in the Alternative): To the extent permitted and applicable, Plaintiff reserves the right to elect statutory damages in lieu of actual damages and profits, in such amount as the Court deems just.

117. Pursuant to 15 U.S.C. § 1116, Plaintiff further seeks the following injunctive relief:

g) A permanent injunction enjoining Defendants, and all persons and entities acting in concert or participation with them, from any further use of Plaintiff's name, image, likeness, or identity in commerce-including in connection with any future Avatar sequels, derivative

43

**COMPLAINT FOR DAMAGES**

works, re-releases, merchandise, licensing, or promotional materials- without Plaintiff's prior express written consent;

h) An order requiring Defendants to take all commercially reasonable steps to remove, alter, or modify any existing commercial materials incorporating Plaintiff's likeness, including the Neytiri character design, where such removal, alteration, or modification is technically feasible, and to substitute appropriately modified materials in all future distributions;

i) An order requiring Defendants to issue corrective advertising and public disclosures, in forms and forums approved by the Court, to dispel the consumer confusion and false impressions created by Defendants' unauthorized use of Plaintiff's likeness, including disclosure of the true source of the Neytiri character design and a correction of any prior false statements regarding Plaintiff's involvement or unavailability;

j) An order requiring Defendants to provide Plaintiff with a verified accounting of all revenues generated from any use of the Neytiri character and any other materials incorporating Plaintiff's likeness, within thirty (30) days of entry of judgment, and to preserve all records relevant to such accounting pending final resolution of this action.

## COUNT II

### Common Law Commercial Misappropriation of Likeness

### (Right of Publicity)

### (Against All Defendants)

118.  Unauthorized Use of Identity: This Count arises from Defendants' commercial conduct - the deliberate extraction and deployment of Plaintiff's facial biometrics as production data for commercial gain - not from any protected expressive act. Defendants used Plaintiff's identity – specifically her likeness (facial features) and persona – in the creation and depiction of the Avatar character Neytiri, as

44

**COMPLAINT FOR DAMAGES**

well as in related merchandise and marketing, without Plaintiff's consent. This use was deliberate and undertaken for Defendants' own commercial advantage. The probability of prevailing is established by Cameron's own recorded public admissions identifying Plaintiff as the design source, the statements of Lightstorm's lead character designer confirming use of Plaintiff's photographs in sculpting the Neytiri maquette, the physical and digital assets distributed across the production pipeline, and the resulting commercial revenues exceeding $2.92 billion worldwide.

119.    Appropriation for Commercial Advantage: Defendants appropriated Plaintiff's likeness for their commercial benefit, including to enhance the marketability of Avatar and its merchandise. By copying Plaintiff's facial features onto the film's lead character, Defendants sought to capitalize on the appeal of Plaintiff's unique look, thereby driving audience engagement and profits. This appropriation was done for Defendants' advantage, commercially or otherwise, satisfying this element of the tort.

120.    Lack of Consent: Plaintiff never consented to Defendants' use of her name, image, or likeness in Avatar or any related project. At the time of the initial taking (2005–2006), Plaintiff was a minor, and no parent or guardian was even aware of – let alone authorized – such use. Later, when Cameron finally mentioned Plaintiff's connection as an "inspiration" (in 2010), he still did not seek or obtain any consent for the ongoing use of her likeness. Thus, every use of Plaintiff's likeness by Defendants was non-consensual.

121.    Resulting Injury: Defendants' misappropriation of Plaintiff's likeness caused and continues to cause Plaintiff significant harm. This includes: loss of control over her public image and identity; denial of the economic value of her likeness (Plaintiff received no compensation or credit while Defendants earned massive profits); and emotional distress upon learning that her face was exploited in a global film without her permission. Plaintiff's reputation and career

**45**

**COMPLAINT FOR DAMAGES**

opportunities have also been hampered – for years she was deprived of the recognition and industry connections that might have arisen had she been properly credited as the basis for Neytiri's appearance. The unauthorized use further exposed Plaintiff to unwanted associations with intimate content (e.g., Neytiri's on-screen love scene) and subjected her to personal offense and anguish. These injuries are the direct result of Defendants' actions.

122.   Elements Met: Under California law, "a common law misappropriation claim is pleaded by alleging: '(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.'" All these elements are clearly present here. Defendants used Plaintiff's identity (her likeness); appropriated her likeness to their own advantage (commercial gain from Avatar and its merchandise); did so without consent; and caused Plaintiff harm as outlined above.

123.   First Amendment Not a Defense (No Transformative Use): Defendants may attempt to invoke the First Amendment by arguing that Avatar is a creative, expressive work. However, their use of Plaintiff's likeness fails the transformative use test and is not protected expression. The work does not comment on or parody Plaintiff – it simply embodies her actual features within a fictional character. The California Supreme Court has held that when a work contains "no significant transformative or creative contribution" beyond a literal depiction of the plaintiff, First Amendment immunity does not apply. Here, Neytiri's appearance was a literal reproduction of Plaintiff's distinctive facial features, with only superficial alterations (blue skin and alien markings; the fundamental structure and essence remained Plaintiff's). The marketability and value of Neytiri derived largely from the appeal of Plaintiff's real visage (even if the public did not know it was hers), not from any transformative genius by Defendants. Indeed, Cameron chose Plaintiff's face precisely because of its

46

natural beauty and authenticity – not to make any commentary about Plaintiff herself. Defendants' conduct is akin to an artist selling unlicensed, lifelike portraits of a person for profit – a clear violation of the right of publicity that the First Amendment does not excuse. Any creative or expressive elements in Neytiri's character do not change the fact that Defendants wholesale lifted a private person's likeness for commercial exploitation.

124.  Damages: As a proximate result of Defendants' misappropriation, Plaintiff has suffered general and special damages in an amount to be proven at trial. These include the economic value of the use of her likeness (for example, the reasonable license fee or percentage of profits from Avatar attributable to her likeness), as well as mental anguish, embarrassment, and loss of dignity. Plaintiff also seeks disgorgement of any profits attributable to the use of her likeness, to prevent Defendants from being unjustly enriched. Additionally, punitive damages are warranted given that Defendants acted willfully, maliciously, and with reckless disregard for Plaintiff's rights.

125.  Injunctive Relief: Plaintiff is entitled to injunctive relief to halt any ongoing or future use of her likeness by Defendants without consent. This includes an order barring Defendants from utilizing the Neytiri design (or any other character derived from Plaintiff's likeness) in new productions or merchandise without proper authorization, and requiring the removal or alteration of Plaintiff's likeness in existing digital assets to the extent feasible. Only through injunctive relief can Plaintiff regain control over her identity and prevent continued infringement.

## COUNT III

**Violation of California Statutory Right of Publicity (Cal. Civ. Code § 3344)**

**(Against All Defendants)**

126.  Plaintiff incorporates by reference all preceding paragraphs as though fully set forth here. This Count arises from Defendants' knowing commercial use of

**47**

**COMPLAINT FOR DAMAGES**

Plaintiff's photograph and likeness for the purpose of advertising and selling Avatar products - conduct that is independently tortious under Cal. Civ. Code § 3344 and does not constitute protected speech in connection with a public issue within the meaning of Cal. Code Civ. Proc. § 425.16. Defendants' conduct as described above violates Cal. Civ. Code § 3344, which provides for liability and statutory remedies when a person's name, photograph, or likeness is used for commercial purposes without consent. The probability of prevailing on this Count is established, inter alia, by: (a) Cameron's own recorded admission that he "used" Plaintiff's face to design Neytiri, satisfying the element of knowing use; (b) Plaintiff's photographs were the actual source input - the "photograph" used in commerce - within the meaning of 3344; (c) the resulting Neytiri character was reproduced on products, merchandise, posters, trailers, and promotional materials distributed in commerce with no consent from Plaintiff; and (d) Plaintiff suffered statutory injury as a result. Each element of 3344 is established by admissible evidence already in Plaintiff's possession.

127. Knowing Use on Products/Advertising: Defendants knowingly used Plaintiff's likeness on or in products, merchandise, or goods, and/or for purposes of advertising or selling such products, within the meaning of § 3344. Specifically, Defendants reproduced Plaintiff's likeness (via the Neytiri character model) in the Avatar film (a product distributed in commerce) and in associated merchandise (posters, figurines, video games, etc.) featuring Neytiri's image. Each such use was part of Defendants' commercial enterprise surrounding Avatar. Defendants further used Neytiri (and thus Plaintiff's likeness) in advertising and promotional materials for the film's theatrical release, home video sales, and even theme park attractions – all with the intent to attract consumers. These uses were carried out with knowledge: Cameron and others knew they were using Plaintiff's actual likeness, as evidenced by their own

48

**COMPLAINT FOR DAMAGES**

admissions (Cameron explicitly acknowledged using her face). Thus, the statutory element of "knowing" use is satisfied.

128.   Direct Connection to Commercial Purpose: Defendants' use of Plaintiff's likeness was directly connected to a commercial purpose – namely, the promotion and sale of the Avatar film and its related merchandise. Neytiri's design (which incorporated Plaintiff's face) was not an incidental background element; it was the central visual asset of the movie's marketing (for example, Neytiri's face was prominently featured on movie posters, trailers, and merchandise packaging). The success of Avatar was directly tied to the audience's engagement with the Neytiri character – engagement achieved in part by the realism and appeal of Plaintiff's likeness. In short, Defendants used Plaintiff's likeness as a selling point of their product. There is a direct causal nexus between the unauthorized use and Defendants' commercial gain, fulfilling Cal. Civ. Code § 3344 requirement of a "direct connection… to a commercial purpose".

129.   Lack of Statutory Exceptions: The use of Plaintiff's likeness does not fall under any exception or exempt context listed in Civil Code § 3344(d). It was not part of a news, public affairs, or sports broadcast, nor any political campaign. Avatar is a fictional entertainment work; and while expressive in nature, it is not news or public commentary about Plaintiff or any public issue – it is a commercial entertainment venture. Plaintiff acknowledges that § 3344 contains an exemption for use of a name or likeness in connection with news, public affairs, or sports broadcasts, or in political campaigns. That exemption is inapplicable here. Plaintiff easily meets her burden to show the exemption does not apply: there is nothing "newsworthy" about using a private individual's face in a fantasy film without consent. Indeed, Defendants themselves never publicly tied the Neytiri character to Plaintiff precisely to avoid any public interest or news scrutiny. Therefore, none of the statutory safe harbors apply. Even if Avatar or its sequels were argued to be matters of public interest in a broad

49

**COMPLAINT FOR DAMAGES**

sense (e.g. popular or award-winning films), the particular use of Plaintiff's likeness was not in service of public discourse – it was a secret act of appropriation for profit. Finally, even if Defendants were to contend that Neytiri's depiction has some newsworthy quality (which it does not), it would still not protect the use of Plaintiff's likeness in a pornographic or explicit context. The law explicitly excludes pornographic or sexually explicit depictions from being deemed newsworthy solely due to fame, and to whatever extent Neytiri's sexual depiction is at issue (the love scene), that certainly cannot be deemed protected news or commentary.

130.    No Consent (Statutory): As already stated, Plaintiff never consented to Defendants' use of her likeness, either in Avatar or in any related product or promotion. This fulfills the consent element of § 3344 – indeed, lack of consent is undisputed here.

131.    Resulting Injury: Plaintiff has suffered injury as a result of Defendants' violation of § 3344. These injuries include those outlined under the First Cause of Action (misappropriation) – emotional distress, humiliation, loss of economic opportunity, etc. – all stemming from the unauthorized commercial use of her likeness. Thus, the statutory requirement of injury is met.

132.    Enhanced Remedies Under Statute: In addition to actual damages, Plaintiff seeks all available statutory remedies under Civil Code § 3344. Cal. Civ. Code § 3344(a) entitles Plaintiff to statutory damages of $750 (or actual damages, whichever is greater) for each unauthorized use of her likeness, plus any profits attributable to the use, as well as attorney's fees and costs. Given the massive scale of Avatar's distribution (including thousands of images/products bearing Plaintiff's likeness), Plaintiff reserves the right to seek an accounting and maximum recovery for each such use (subject to any election of remedies to avoid double recovery). Plaintiff also seeks punitive damages under § 3344 to the extent allowed. (The statute provides that its remedies are cumulative to

**50**

**COMPLAINT FOR DAMAGES**

common law and does not limit punitive damage recovery for willful violations.) Defendants acted with oppression, fraud, and malice – consciously disregarding Plaintiff's rights – which justifies an award of exemplary damages to deter such conduct.

133. "Transformative Use" Defense Not Applicable: If Defendants raise the First Amendment "transformative use" defense (per Comedy III and related cases) against the § 3344 claim, Plaintiff reiterates that the defense fails for the reasons stated under the First Cause of Action. The transformative use doctrine is considered an affirmative defense, but on the face of things, Defendants' use was not transformative in a manner that would outweigh Plaintiff's statutory right. The Avatar portrayal did not significantly transform Plaintiff's identity so much as embed it; the commercial value of Neytiri's likeness was derived from Plaintiff's real features, indicating an insufficient transformation. Thus, the § 3344 claim is not shielded by the First Amendment (just as the parallel common law claim is not).

**134.** Prayer for Relief (Cal. Civ. Code § 3344): Plaintiff seeks all relief afforded by Civil Code § 3344, including injunctive relief, statutory damages (at least $750 per violation), disgorgement of profits, punitive damages, and an award of reasonable attorney's fees and costs. (Specific relief is further detailed in the Prayer for Relief at the end of this Complaint.)

**COUNT IV**

**False Light Invasion of Privacy**

**(Against All Defendants)**

135. Plaintiff incorporates all prior paragraphs as though fully set forth here. This Count arises from private communications and omissions directed at Plaintiff - specifically, Cameron's false written note delivered personally to Plaintiff in 2010, his private verbal assurances of allyship, and the sustained private concealment of the true nature of the misappropriation - none of which

51

constitutes a "statement... made in a place open to the public or a public forum in connection with an issue of public interest" under Cal. Code Civ. Proc. § 425.16(e)(3), or any other category of protected activity under Cal. Code Civ. § Proc. 425.16(e). The false representations identified herein were not matters of public concern; they were private misleading statements designed to suppress Plaintiff's awareness of a legal wrong committed against her. Defendants' conduct in misusing Plaintiff's likeness while misrepresenting her involvement placed Plaintiff in a false light before the public that is highly offensive and damaging.

136. Publicity of a False Portrayal: Defendants, through the Avatar films and related publicity, publicized information and imagery that portrayed Plaintiff in a false light. Specifically, by using Plaintiff's likeness for the character Neytiri without giving her credit, Defendants created the misleading impression to the public that Plaintiff had no role in – and no objection to – the use of her identity. Effectively, Defendants' actions falsely suggested either (a) that the character was entirely fictional (implying her likeness was not used at all), or (b) if the resemblance were ever discovered, that Plaintiff had willingly inspired or contributed to the character (implying her endorsement or consent). In either case, the truth – that her likeness was taken without her permission – was obscured. Furthermore, Cameron's 2010 note and subsequent silence created a false narrative that Plaintiff had simply been an "inspiration" who was unavailable to participate, thereby implying that Plaintiff chose not to be involved or was content with being just a muse. This portrayal is patently false. Plaintiff did not consent to or knowingly inspire the use of her face, nor was she ever "too busy" to be involved – she was never asked. Defendants also, in effect, depicted Plaintiff (via the Neytiri character) engaging in on-screen intimate acts (the Neytiri love scene). This could lead viewers – especially those who later learn of Plaintiff's connection – to the false assumption that Plaintiff herself approved

52

or participated in such portrayal. In summary, Defendants have publicly presented a distorted reality regarding Plaintiff's relationship to Avatar: they turned her into an unwitting character on screen and lied by omission about her lack of consent off screen.

137.   False Light Would Be Highly Offensive: The false light created by Defendants' actions would be highly offensive to a reasonable person in Plaintiff's position. Being depicted (albeit in alien guise) as a character in a blockbuster film without one's consent is a grave violation of personal dignity and autonomy. Any reasonable person would be outraged to discover her face was digitally woven into a hugely popular movie without her knowledge. Moreover, the specific false narrative – that Plaintiff supposedly had a chance but was "busy," or that she willingly served as an unnamed muse – is deeply offensive because it paints Plaintiff as either irrelevant or complicit in her own exploitation. It suggests she accepted (or didn't deserve) the lack of credit or involvement, which is humiliating and untrue. Additionally, the implication that Plaintiff, through Neytiri, appeared in an intimate scene without consent would be highly offensive to a reasonable person, especially someone who was a minor when the image was taken. Thus, the false light here (of a consenting or indifferent muse whose likeness was used intimately) is highly offensive to a reasonable observer.

138.   Defendants' Knowledge of or Reckless Disregard for Falsity: Defendants knew or acted in reckless disregard as to the falsity of the impression they created. Cameron and the other Defendants knew that Plaintiff had not consented and was not credited. They nonetheless presented Avatar to the world without clarifying her contribution. Cameron's half-truth in 2010 (telling Plaintiff "Too bad you were shooting another movie") shows actual knowledge of the real situation coupled with an intent to mislead. At the very least, Defendants acted with reckless disregard for the truth by continuing to let the public assume the character was entirely fictional or that any resemblance was

**53**

**COMPLAINT FOR DAMAGES**

licensed/inspirational. Defendants had numerous opportunities to correct the record (in behind-the-scenes features, interviews, etc.) but deliberately chose not to, in order to avoid controversy and liability. This satisfies the "actual malice" standard (knowledge or reckless disregard of falsity) required for a false light claim, especially given that Plaintiff is not a public figure and this was a matter concerning her private rights.

139.    Identifying Plaintiff as the Subject: Although the general public did not know Neytiri was based on Plaintiff until recently, the false light claim is still valid. Among those in the know (the Avatar design teams, industry insiders, or those who saw Cameron's admissions), the portrayal clearly concerned Plaintiff and conveyed false implications about her. Moreover, once Plaintiff's connection became known (through the Tech Noir video and subsequent discussions), the earlier public portrayal retroactively casts her in a false light in the eyes of all who learn of it. Essentially, the moment Cameron revealed "this is her lower face," the world could identify Q'orianka Kilcher as being tied to Neytiri – and all the past depictions of Neytiri (including the intimate scenes and lack of credit) suddenly reflect on Plaintiff. Thus, she was identifiable in context, fulfilling this element.

140.    Damages (False Light): As a direct result of Defendants' false light portrayal, Plaintiff has suffered harm including emotional distress (such as feelings of humiliation, indignation, and betrayal upon learning how she was portrayed and misrepresented) and damage to her reputation. People who learn the story might wrongly assume Plaintiff was complicit or at least acquiescent in the use of her face (since she didn't sue earlier and was friendly with Cameron). This can cause others to view her as naïve or as someone who "didn't mind" the exploitation, potentially affecting her image as an activist and professional. The emotional impact of discovering the truth after so many years of believing a lie is profound.

**54**

**COMPLAINT FOR DAMAGES**

Plaintiff experienced shock, grief, and anger at being deceived and used. She will detail these damages at trial.

141.    Prayer for Relief (False Light): Plaintiff seeks compensatory damages for the harm to her peace of mind, emotional well-being, and dignity resulting from this false light invasion of privacy. Given the egregiousness of Defendants' conduct – intentional, hidden, and injurious – Plaintiff also seeks punitive damages to punish and deter such conduct. Additionally, Plaintiff asks the Court to consider injunctive relief to correct the public record (for example, requiring Defendants to issue clarifications or credit Plaintiff appropriately in any future behind-the-scenes publications). (All specific relief is outlined in the Prayer for Relief below.)

## COUNT V

### Intrusion Upon Seclusion (Invasion of Privacy)

### (Against All Defendants)

142.    Plaintiff incorporates all prior allegations as if fully set forth. This Count arises from Defendants' non-expressive commercial act of physically and digitally extracting the biometric characteristics of Plaintiff's face without her consent for use as commercial production data. The extraction, replication, and distribution of a private individual's biometric facial features for commercial gain is not an act of free speech; it is a commercial trespass upon the most intimate aspect of personal identity - one's own face. As such, this claim does not arise from any act in furtherance of Defendants' right of free speech in connection with a public issue under Cal. Code Civ. Proc. § 425.16, and the anti-SLAPP statute does not apply. In the alternative (or in addition) to the misuse of her public image, Defendants also committed an intrusion upon seclusion by intruding into the private sphere of Plaintiff's life to obtain information or likeness that she kept private.

143.    Intrusion into Private Affairs: Plaintiff's facial image – especially the detailed biometric aspects of her face – is an inherently personal aspect of her identity. At

55

COMPLAINT FOR DAMAGES

age 14–15, when the key reference photo was taken and used, Plaintiff was a private individual (and a minor). She had a reasonable expectation of privacy in her person, especially against having her image secretly studied, copied, and digitized by strangers for commercial ends. Defendants intentionally intruded into Plaintiff's private affairs by taking her photograph (from the Los Angeles Times or other sources) and subjecting it to detailed scrutiny, replication, and distribution through their design pipeline, all without her knowledge. Effectively, they examined and reproduced her facial features – a quasi-biometric invasion – as if taking a digital scan of her face without consent. If, as discovery may show, Defendants obtained reference images through means beyond the published photo (e.g., any secret photography or image enhancement), that would further underscore the intrusion. But even using a published photograph, Defendants' actions went beyond passive observation; they actively dissected and replicated Plaintiff's likeness for a purpose never intended by the original context of that photo. This constitutes an intentional intrusion into her personal life and identity.

144.    Highly Offensive Method of Intrusion: The manner of Defendants' intrusion would be highly offensive to a reasonable person. Secretly selecting a 14-year-old girl's face, blowing it up in art departments, sculpting it in clay, scanning it with lasers, and sharing its digital representation among multiple companies – all without telling her – is egregiously invasive. A reasonable person would consider it a profound violation to have one's image used as source data in this way. It treated Plaintiff not as a human being with rights, but as an object or dataset to be mined. Furthermore, doing this to a minor, and specifically an Indigenous minor, adds layers of offensiveness (exploiting a child and possibly invoking historical traumas of using Indigenous people's bodies without consent). The intrusion here is not a trivial or routine privacy invasion; it was a sustained, covert exploitation of Plaintiff's personal likeness. Any reasonable person in

Plaintiff's position would find Defendants' conduct highly offensive and outrageous.

145.    Private Matter: At the time of the intrusion, Plaintiff's facial likeness (especially as a minor) was a private matter. She was not a public figure, and her appearance was not public domain for anyone to appropriate. The fact that she had acted in a film (The New World) does not mean her likeness could be taken for unrelated uses; that would be contrary to right-of-publicity and privacy principles. Additionally, the intimate use of her likeness in a sexual context (the Neytiri love scene) intruded on a deeply private aspect of life – one's sexuality and depiction in sexual situations. Plaintiff never publicized or consented to any sexual portrayal. Thus, the matters intruded upon (her face and implied sexual depiction) were undeniably private.

146.    Causation and Harm: As a direct result of this intrusion, Plaintiff has suffered mental and emotional suffering. The realization that strangers pored over her face and incorporated it into a film without permission has caused extreme discomfort, anger, and anxiety. She feels violated at a basic personal level. The intrusion also potentially caused her to lose some control over her own sense of privacy and security – for years she did not know, but now she must live with the knowledge that her likeness was handled in this manner. The harm includes emotional distress (such as outrage, humiliation, and loss of trust) and any consequent effects on her life (difficulty trusting industry people, etc.). These damages will be detailed at trial.

147.    Prayer for Relief (Intrusion): Plaintiff seeks compensatory damages for the intrusion, including for mental and emotional suffering. The egregiousness of Defendants' conduct – intentional, hidden, and injurious – also warrants punitive damages to punish this invasion of privacy and deter such conduct. Additionally, Plaintiff seeks appropriate injunctive relief to prevent further intrusions (such as

**57**

**COMPLAINT FOR DAMAGES**

prohibiting Defendants from any future use of her likeness without consent and ordering the destruction of any materials obtained through the intrusion).

## COUNT VI

## Public Disclosure of Private Facts

## (Against All Defendants, in the Alternative to False Light)

148.   Plaintiff incorporates all preceding allegations here. In the alternative to (or alongside) the false light claim, Plaintiff pleads public disclosure of private facts. If Defendants attempt to argue that by not crediting Plaintiff they avoided "publicity" about her, Plaintiff asserts that to whatever extent facts about her were revealed, they were private facts whose disclosure was not justified. Conversely, if one views the portrayal of Neytiri performing intimate acts as effectively disclosing something about Plaintiff (given the link), that too is actionable as described below.

149.   Public Disclosure: Defendants, by creating and distributing the Avatar film and related media, publicly disclosed certain facts or portrayals about Plaintiff that were private. Chief among these is an implicit disclosure of Plaintiff's intimate conduct. When Defendants used Plaintiff's likeness for Neytiri and then depicted Neytiri in a sexual context (the love scene), they were effectively – albeit indirectly – disclosing to millions of viewers a portrayal of Plaintiff (through her likeness) engaged in intimate acts she never performed. This is a disclosure to the public at large (a global film audience). Additionally, once Cameron revealed whose face it was, it retroactively framed that sexual portrayal as one of Q'orianka. Even before that revelation, internally, Defendants had essentially shared Plaintiff's likeness widely among teams and possibly partner companies (WETA, Gentle Giant, etc.), disclosing her image in ways she did not approve. For purposes of this tort, we focus on the public dissemination: the film, merchandise, etc., which reached a broad audience.

**58**

**COMPLAINT FOR DAMAGES**

150.   Private Facts Disclosed: The facts or content disclosed were private. Plaintiff's appearance in a sexual scenario (even via an avatar) is a deeply private matter – something she did not consent to share with the world. Unlike a news event or a public record, there was no public aspect to Plaintiff's personal life that made this fair game. Additionally, the very fact that her likeness was used (before she became aware) was itself a private fact from her perspective – one that even she didn't know, and certainly not one the public was entitled to know. If the situation is viewed as Defendants having disclosed "someone's face" in that scene, it was a private face (hers) that they revealed under false pretenses.

151.   Highly Offensive and Not of Legitimate Public Concern: The public disclosure of these private facts is highly offensive to a reasonable person and not of legitimate public concern. Showing what is effectively a real person's face in an intimate act without their consent is highly offensive by any measure. People have the right not to be displayed in sexual contexts publicly without permission. Moreover, there is no legitimate public interest in seeing Q'orianka Kilcher's likeness used in such a way. Avatar could have achieved its story without using a real person's features, or at least without using them in the love scene – the choice to do so was a creative one, not tied to informing the public about any newsworthy issue concerning Plaintiff. To the extent Defendants might claim the Avatar story itself was newsworthy or artistic, that does not extend to using a private individual's identity in that story. Indeed, Defendants kept Plaintiff's identity secret, which shows even they did not consider it newsworthy – it was purely exploitative. Therefore, the disclosure fails the test of newsworthiness or public concern. It was simply not something the public had any right or need to know.

152.   Damages: Plaintiff has suffered harm as a result of this public disclosure of private facts. The primary harm is emotional distress – Plaintiff experienced significant embarrassment, anxiety, and trauma upon learning that effectively

59

her likeness had been "exposed" in a sexual context to a worldwide audience. Even though viewers did not know it was her at the time, the fact remains that her own sense of privacy was violated. She feels as though a private aspect of her life (her face, her implied participation in an intimate scene) was broadcast without her permission. She also fears stigma or judgment from those who learn of this (for example, in her community or among those who may misunderstand the situation). These damages, including emotional and any reputational impact, will be demonstrated at trial.

153.    Prayer for Relief (Public Disclosure): Plaintiff seeks damages for the public disclosure of private facts, including damages for mental anguish and emotional distress. She also seeks punitive damages given the willful and reckless disregard of her privacy rights shown by Defendants. Additionally, injunctive relief is appropriate to prevent any further dissemination of these private depictions (such as editing the scene in future releases, as sought elsewhere).

## COUNT VII

**Statutory Unauthorized Digital Replica in Sexually Explicit Depiction ("Deepfake Porn" - Cal. Civ. Code § 1708.86)(Against All Defendants)**

**Statutory Unauthorized Digital Replica in Sexually Explicit Depiction ("Deepfake Porn" – Cal. Civ. Code § 1708.86)**

**(Against All Defendants)**

154.    Plaintiff incorporates all prior paragraphs. This Count arises from Defendants' commercial conduct - the deliberate creation and intentional mass distribution of a digitized, sexually explicit depiction of Plaintiff's likeness as a commercial entertainment product - and not from any protected act of free speech. Because Defendants are entities primarily engaged in selling entertainment goods and services, and because this Count arises from their commercial conduct in creating and distributing Avatar as a product, Cal. Code Civ. Proc.  425.17(c)'s commercial speech exception bars any anti-SLAPP

60

challenge to this Count. Moreover, Cal. Civ. Code § 1708.86 was enacted precisely to address the commercial creation and distribution of non-consensual digitized sexual depictions; a lawsuit to enforce that statute enforces an important right affecting the public interest in bodily autonomy and the integrity of one's digital likeness, satisfying the 425.17(b) public interest exception as well. Defendants violated Cal. Civ. Code § 1708.86 by creating and disclosing a digitized, sexually explicit depiction of Plaintiff without her consent. The probability of prevailing is established by: (a) the Neytiri love scene in Avatar constituting a "sexually explicit" depiction within the meaning of 1708.86; (b) Plaintiff's facial features, as Cameron himself admitted, formed the literal anatomical basis for the Neytiri character depicted in that scene; (c) Plaintiff never consented to any such depiction; and (d) Defendants created, distributed, and commercially exploited this material through theatrical, home video, and streaming release worldwide.

155.   Protected Individual & Definitions: Plaintiff is a "depicted individual" within the meaning of § 1708.86: she is an individual whose actual likeness was portrayed through digitization to appear as if engaging in sexual conduct she did not in fact perform. The Avatar character Neytiri qualifies as "digitally created sexually explicit material" to the extent it depicts Plaintiff's likeness in a sexual context. Specifically, Neytiri's love scene involves sexual conduct (implied intercourse and intimate touching) — which falls under the statute's broad definition of "sexual conduct" (including intercourse or simulated sexual acts) and a depiction of a person appearing to engage in such conduct. Through CGI technology, Defendants placed Plaintiff's face (her likeness) onto this sexual scene. Thus, there was a "digitization" of Plaintiff engaging in sexual conduct on screen, even though Plaintiff never actually performed any such act. In short, Avatar contains what is effectively a non-consensual "deepfake" of Plaintiff in a sexual situation. Plaintiff was never involved in that performance, making it a falsified and unauthorized sexual depiction of her.

**COMPLAINT FOR DAMAGES**

156.   Creation and Disclosure: Defendants, acting individually and in concert, created and intentionally disclosed the digitized sexually explicit material portraying Plaintiff. James Cameron and the Lightstorm team created the Neytiri digital model with Plaintiff's face and the intimate scene in question. The corporate defendants (Lightstorm, Fox, Disney) then disclosed that material by distributing the film to the public in theaters, on home media, streaming, etc. The statute covers both creators and intentional disclosers of such content. Here, Cameron/Lightstorm fall under § 1708.86(b)(1) (persons who create and also disclose the material, knowing there's no consent), and Fox/Disney fall under § 1708.86(b)(2) (persons who, though they didn't create it, disclosed it, knowing or reasonably should have known there was no consent). They all facilitated each other, which could also implicate aiding and abetting liability under § 1708.86(b)(3). In summary, Avatar was intentionally shown to millions, so the disclosure element is undeniably satisfied.

157.   Knowledge of Non-Consent: Defendants knew or reasonably should have known that Plaintiff did not consent to the creation or disclosure of this digitized sexually explicit material. Indeed, they never asked her. By the statute's standards, knowledge is present: a person who uses someone's likeness in a sex scene without ever obtaining consent can be presumed to know the individual did not consent. Cameron's very act of hiding it indicates he knew she hadn't agreed. Even Fox/Disney, if they somehow lacked direct knowledge, should have known that the actress whose face was used was not actually participating or consenting — the fact that Q'orianka's name is nowhere in the credits or production should have been a red flag if anyone had thought about it. But ignorance is no excuse; they are charged with knowledge reasonably obtainable in the exercise of minimal diligence. Additionally, Plaintiff was arguably a minor during part of this process: she was 14–15 during the design phase and around 17 by the time the film was finalized. The statute provides that lack of consent or being a minor

62

COMPLAINT FOR DAMAGES

at creation time triggers liability. If Plaintiff is considered a minor at the time of creation (arguably yes, since the likeness was captured and initially used when she was 14–15), that is an independent trigger for liability (no consent needed in that case); but even if that provision isn't applied, the non-consent is crystal clear.

158.    No Exceptions Apply: Cal. Civ. Code § 1708.86(c) provides exceptions for matters of legitimate public concern, works of political or newsworthy value, commentary, etc., but explicitly excludes pornography from being deemed newsworthy just because the individual is famous. Here, Plaintiff was not a public figure at creation, and the depiction in Avatar is pure entertainment, not commentary on her. It's definitely not news or public affairs – it's a fictional story with a pornographic element as far as Plaintiff is concerned (her face in a sexual scene). Therefore, Defendants cannot claim any safe harbor of public interest. Also, disclaimers don't shield liability (and they gave none anyway). In short, the content falls squarely under unlawful deepfake pornography with no First Amendment or Section 230 defense applicable (Defendants are content creators/distributors, not third-party platforms).

159.    Injury: Plaintiff has suffered harm as a result of this violation, including emotional distress and potential reputational harm. Emotionally, Plaintiff experiences shame, humiliation, and anxiety knowing her likeness was used in a sexual manner without consent. She feels violated at an intimate level; the idea that her face was effectively made to perform a sex scene is extraordinarily distressing to her. Reputationally, associating her with a sexual depiction (especially one involving alien characters) could alter or tarnish her public image in ways she can't control, should it become widely known. The statute recognizes these types of harm and allows recovery for both economic and non-economic damages (including emotional distress) for the prevailing plaintiff. Plaintiff's

COMPLAINT FOR DAMAGES

emotional turmoil upon discovering this explicit use was profound; she will testify to the feelings of violation and outrage.

160.    Remedies Under § 1708.86: Plaintiff seeks all remedies authorized by the statute. These include:

- Actual damages: covering emotional distress and any economic loss (though emotional harm is the primary injury here).

- Statutory damages: Plaintiff elects to seek statutory damages as permitted by § 1708.86(f)(1)(B). The statute provides for statutory damages between $1,500 and $50,000 per violation, or up to $250,000 if the conduct was committed with malice. Given that Defendants acted maliciously (willfully disregarding Plaintiff's rights and dignity, arguably for profit), Plaintiff will seek the maximum statutory amount for each work or medium in which the depiction was disclosed. Here, at least the original *Avatar* film qualifies as one "work"; if any sequels reused the model in a sexual context, those could count separately. Plaintiff will ask for $50,000 for the creation/disclosure of the *Avatar* depiction (and up to $250,000 if malice is found by the trier of fact).

- Disgorgement of Profits: The statute allows recovery of any monetary gain made by Defendants from the creation or disclosure of the material. Given *Avatar*'s immense profits, some portion of those profits is arguably attributable to including a realistic romantic storyline that benefited from the emotional resonance of Plaintiff's likeness. While it might be challenging to apportion, Plaintiff may seek an order requiring Defendants to disgorge any profits that the Court or jury finds were earned as a result of using her likeness in this manner (as a form of restitution or equitable relief).

- Punitive damages: The statute expressly allows punitive damages. Plaintiff seeks punitive damages due to Defendants' malicious conduct.

64

**COMPLAINT FOR DAMAGES**

They knew this would violate fundamental personal rights and did it anyway, perhaps even joking about it internally later (we will explore evidence of any cavalier attitude). This wanton disregard for Plaintiff's dignity warrants punishment beyond the statutory minimum.

- Attorney's fees and costs: The statute provides that a prevailing depicted individual can recover reasonable attorney's fees and costs. Plaintiff requests such an award to enable her to vindicate her rights under this law.

- Injunctive relief: Most critically, Plaintiff seeks injunctive relief requiring Defendants to remove and delete any digital materials that depict Plaintiff in a nude or sexual situation. This includes, to the extent practicable, editing or altering the Neytiri love scene in any current or future releases of *Avatar*. At minimum, an injunction should forbid Defendants from using Plaintiff's likeness in any future visual material that shows sexual conduct, and compel Defendants to destroy any files or models in their possession that incorporate Plaintiff's likeness for such purposes. (In essence, stop the spread and continuing availability of this non-consensual depiction. While the film is already out, they can be ordered to cease any new screenings or editions that include the scene, or substitute an edited version; these details can be worked out in enforcement.)

161. Statute of Limitations Compliance: Section 1708.86 has a statute of limitations of three years from discovery of the unauthorized creation/disclosure. Plaintiff discovered the relevant facts in 2025, and this suit is well within three years of that discovery. Thus, this claim is timely brought.

162. In summary, Defendants orchestrated what California law now squarely forbids: a non-consensual deepfake sexual depiction of Plaintiff. They must answer for this statutory violation and be subjected to the full breadth of

remedies the law provides, to compensate Plaintiff and deter such conduct in the future.

## COUNT VIII

### Intentional Interference with Prospective Economic Advantage

### (Against All Defendants)

163.    Plaintiff incorporates all prior allegations here. This Count arises from Defendants' independently tortious commercial acts - the misappropriation of Plaintiff's likeness, the fraudulent concealment of that misappropriation, the deceit practiced upon Plaintiff, and the systematic exclusion of Plaintiff from any compensation or credit - none of which constitutes protected speech or petitioning activity under Cal. Code Civ. Proc. § 425.16. The wrongful means employed by Defendants are each independently actionable torts and statutory violations, satisfying the Della Penna requirement and simultaneously defeating any argument that this Count arises from protected activity. See *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 902 P.2d 740 (1995). Defendants' conduct intentionally interfered with Plaintiff's prospective economic relationships and opportunities in her career, causing her harm.

164.    Existing Economic Relationships with Probability of Future Benefit: At the time of Defendants' actions (mid-2000s through the 2010s), Plaintiff had – and was developing – economic relationships in the entertainment industry that carried a probability of future economic benefit. For example:

- Relationship with Talent Agents/Casting Professionals: Plaintiff, through her agent, was actively pursuing roles around that time (including attempting to audition for *Avatar* in 2007). This pursuit constitutes an economic relationship between Plaintiff (the talent) and casting directors/producers/studios, aimed at securing employment with attendant financial benefit. There was a reasonable probability that, absent interference, Plaintiff could have landed a

role in a high-profile project like *Avatar* or similar big-budget films, given her early acclaim from *The New World*.

- Prospective Relationship with Defendants for Avatar and Sequels: Plaintiff had a realistic expectation of being considered for Avatar, particularly once Cameron himself recognized her unique qualities enough to use her likeness. In a normal scenario (one without secret appropriation), this could have led to an audition or even hiring. This represents a potential economic relationship (actress and film production) with a probability of benefit (salary, exposure, career boost). Similarly, for the sequels, there was an expectancy she might be involved (she was even invited to discuss it in 2017).

- Relationship with the Audience/Fanbase and Sponsors: Had Plaintiff been known as the model/inspiration for Neytiri, she could have leveraged that fact in public appearances, conventions, or endorsements. This is a prospective economic advantage deriving from public recognition (for instance, paid appearances at fan events, increased social media following leading to sponsorships). Because Defendants kept her uncredited, she lost out on connecting with the *Avatar* fanbase in that way.

- Her Ongoing Career Trajectory: Plaintiff had significant momentum from *The New World* and her activism notoriety. There was an expectancy that she'd capitalize on her unique background and talent to secure more major roles. Being effectively "the face of Neytiri" (had it been public) could have supercharged this trajectory. Even without that, her career had many potential paths that required her reputation to remain untarnished and her opportunities unobstructed.

**67**

**COMPLAINT FOR DAMAGES**

*(These relationships/opportunities are illustrated in paragraphs above and were known to Defendants or reasonably apparent given Plaintiff's status as a young actress on the rise.)*

165.    Defendants' Knowledge: Defendants were aware, or certainly should have been aware, of Plaintiff's economic relationships and expectancies. James Cameron knew of Q'orianka's rising star – he saw her in The New World, a notable performance for a teenager. He was aware she had an agent because her agent tried to contact Avatar casting. Cameron even acknowledged (falsely) her "shooting another movie," which indicates he assumed she had other work engagements. All of this shows Defendants recognized Plaintiff's commercial potential, enough that they used her image to enhance their film. Thus, they knew or had reason to know that Q'orianka had valuable economic prospects in acting that could be affected by their actions. They certainly knew she would have benefitted from being actually involved in Avatar (since they thought to invite her in 2017 perhaps out of guilt or to keep her on the hook). This satisfies the knowledge element.

166.    Intentional Disruption via Wrongful Acts: Defendants intentionally engaged in wrongful conduct that prevented Plaintiff's relationships from developing or fruitioning. The wrongful acts here include, but are not limited to:

- Misappropriating her likeness instead of hiring/casting her: By secretly using Plaintiff's identity to craft Neytiri, Defendants effectively took the benefit of Plaintiff's talent/appearance for themselves while excluding Plaintiff from the job. This is independently wrongful (violating her right of publicity, among other laws). It disrupted the potential economic relationship between Plaintiff and the *Avatar* production – they never even auditioned or hired her because they had already gotten what they wanted (her look) for free. Essentially, they filled a role using her likeness

68

**COMPLAINT FOR DAMAGES**

without paying her, thereby denying her the opportunity to fill it herself or to be compensated. This torpedoed a probable economic advantage (starring in or being associated with a blockbuster).

- Deceiving Plaintiff with the "busy with another movie" excuse and token "inspiration" credit: This wrongful act (fraudulent misrepresentation) lulled Plaintiff into not pursuing the matter further at the time. Had she known the truth, she might have asserted her rights or at least garnered public attention for it, which could have led to economic opportunities (even being known as the uncredited model for Neytiri could have had value). The deceit was intended to stop her from doing anything that might disrupt Defendants' plans, which it did – thereby interfering with her ability to generate buzz or claim credit that might have benefitted her career. This is wrongful (fraud) and it directly interfered by keeping her passive during a critical time when *Avatar* was fresh.

- Omitting her name publicly (ensuring she got no credit): This is a wrongful omission in context (tied to the misappropriation scheme). By cutting her out of any acknowledgment, Defendants interfered with Plaintiff's ability to gain fans, industry clout, or goodwill from *Avatar*'s success. In Hollywood, recognition often leads to more work; Defendants intentionally prevented that by leaving her uncredited. This is independently wrongful as part of the appropriation (and arguably a breach of basic fairness/custom in the industry – if someone's image is used, at least a courtesy credit should be given; failing to do so was deceitful and unfair).

- Continuing to exclude her from sequels or related roles under false pretenses: In 2017, they had her sign an NDA and meet about future *Avatar* films, but ultimately did not include her. Perhaps this was

69

**COMPLAINT FOR DAMAGES**

just to placate her or keep her hopeful. If evidence shows they strung her along (negligent misrepresentation) to keep her cooperative or to avoid her making a claim, that's another wrongful act interfering with her pursuing other opportunities (for instance, she might have kept her schedule open or hopes up for *Avatar* sequels instead of aggressively seeking other work).

- General exploitation reducing her novelty: By saturating the market with "her look" via Neytiri (without acknowledging it's her), Defendants arguably diminished the uniqueness of Plaintiff's casting appeal. For example, if another project considered casting Q'orianka for her distinctive appearance, they might now find that look closely associated with Neytiri/Zoe Saldana's character, potentially reducing demand for Q'orianka herself. This is speculative but conceivable as a form of interference by "using up" her distinctive trait in the market without crediting her. (Essentially, they took the very thing that made her special in casting terms and gave it to someone else's career.)

167. All these acts were intentional. Defendants did not accidentally omit her name or accidentally use her face; these were conscious choices. And they were independently wrongful: misappropriation (a tort), fraud/deceit (a tort), statutory violations, etc., satisfy the Della Penna requirement of a wrong beyond just competitive behavior. (Note: This isn't a typical business competitor situation, but the law of interference requires a wrongful act independent of the interference – which we have in abundance here.)

168. Actual Disruption: Defendants' conduct did disrupt or divert the prospective advantages that Plaintiff otherwise likely would have gained. Concrete examples include:

70

**COMPLAINT FOR DAMAGES**

- Plaintiff did not get the role in Avatar (nor any compensation/royalty from it), whereas absent Defendants' wrongdoing, one of two things could have happened: either (a) Cameron might have actually cast Plaintiff as Neytiri (he clearly found her suitable – indeed, he used her face), in which case she'd have earned significant income and career momentum from starring in a blockbuster; or (b) if for some reason she wasn't cast, at least they might have engaged her in some capacity (a cameo, or promotional credit) had they not been secretly using her likeness. In reality, by stealing her likeness, they foreclosed the chance of her involvement. The relationship between Plaintiff and the Avatar project was disrupted entirely – she got zero official connection when she by rights should have had one of some kind.

- By not being credited or known as "the face of Neytiri," Plaintiff missed out on press and media exposure. If she had been publicly acknowledged (say, listed in the art book or a featurette as a character inspiration or model), she could have capitalized through interviews, fan conventions, etc. The *Avatar* fandom is huge; being associated with Neytiri could have led to paid appearances or signings. None of that occurred, because no one knew of her involvement. That's an opportunity cost and disruption of expected career enhancement.

- The false narrative possibly harmed her reputation with her agent or others in the industry. For instance, her agent tried to get her in *Avatar* and presumably they were turned down with no clear explanation. If any explanation given was the false "busy with another movie" excuse or something similar, it could have made her agent or casting people think she wasn't available or had scheduling

71

issues – thus chilling some enthusiasm for her. Even subtle, that is a disruption in her business relationships.

- In later years, Q'orianka's lack of any tie to *Avatar* meant she couldn't leverage it to get similar epic roles, whereas Zoe Saldana (who played Neytiri) enjoyed a huge career boost. It's reasonable to believe that if Q'orianka had either played Neytiri or been publicly tied to it, she too would have seen a significant career uptick. Defendants' interference – using her look but not her person – diverted that benefit to someone else. Essentially, they gave another actress an advantage that rightfully stemmed from Plaintiff's features.

169.    Therefore, Plaintiff's potential economic benefits were sabotaged. This may not be a conventional scenario of a lost contract, but interference law also covers the diverting or depriving of probable expectancies by unlawful means, which is exactly what happened.

170.    Defendants' Intent: Defendants either intended to disrupt these opportunities or knew with substantial certainty that disruption would result from their actions. One can infer that Cameron intended to keep Q'orianka out of the picture (literally and figuratively) to avoid legal issues or having to compensate her. His "Next time" note was likely meant to pacify her, indicating he intended to prevent her from raising a fuss that might interfere with Avatar's rollout – which is essentially intent to interfere with her obtaining any deal or credit from Avatar. Even if one argues Defendants' primary intent was just to benefit themselves (and not specifically to harm her), the law allows intent to be shown by knowledge that harm to plaintiff's relationships was a likely result. They knew that using her without credit would keep her unknown and uncompensated – a result they certainly foresaw and indeed desired (to save money and avoid complication). Thus, they either desired to exclude her from any financial

72

participation (intentional interference), or knew it was certain she'd get nothing and still proceeded (which meets the intent requirement under *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153–54, 63 P.3d 937 (2003)).

171.    Wrongfulness: As detailed above, the acts were independently wrongful. They violated statutes (publicity rights, deepfake law), constituted torts (privacy invasions, misappropriation, fraud), and possibly breached fiduciary or ethical duties. This more than satisfies the requirement that the interference be via wrongful means beyond just fair competition. It's worth noting this isn't a scenario of normal business competition at all – Plaintiff wasn't a competitor to Defendants, she was a resource they exploited. The exploitation is legally wrongful on multiple counts described above.

172.    Damages: Plaintiff suffered economic harm proximately caused by Defendants' interference. She lost the opportunity to earn income from Avatar – which can be measured in various ways (what an unknown actress might have been paid for the role, or what license fee a VFX company would pay for an image use, or a percentage of profits from such a contribution). She lost prospective income from increased fame – while somewhat speculative, a jury can evaluate the lost chance by looking at career trajectories (for example, Zoe Saldana's career post-Avatar vs. Plaintiff's). It's plausible to claim millions in lost earnings potential (given Avatar's success, involvement could have skyrocketed Plaintiff's career), or at least substantial six or seven figures in missed opportunities and appearances. Even if not millions, certainly tens or hundreds of thousands in concrete terms (appearance fees, minor roles she might have gotten, etc.). She also lost potential deals like maybe a book or speaking engagements about her activism that she could have more easily gotten with the Avatar spotlight. These losses are directly traceable to Defendants freezing her out via their wrongful acts. She additionally incurred emotional distress, but in interference claims the focus is on economic harm (though mental anguish from career sabotage can

**73**

**COMPLAINT FOR DAMAGES**

sometimes be considered if it impacts her professional life). We emphasize the financial here, with the understanding that other claims cover emotional harm.

173. Request for Relief (Interference): Plaintiff seeks to recover damages for the loss of the prospective economic advantages. This includes the value of the Avatar role/credit she was denied, lost future earnings attributable to that lost break, and loss of goodwill or career momentum. These may require expert testimony (for example, an economist to project the difference in career earnings had she been associated with Avatar). Also, because Defendants' interference was willful and with malice, punitive damages are warranted to punish the deliberate sabotaging of her career opportunity. The wrongful acts were despicable given the context of power imbalance and deception.

174. In sum, through a series of underhanded actions, Defendants robbed Plaintiff not only of her likeness but of the career boost and earnings that should have accompanied the use of her likeness. This intentional interference with her livelihood is actionable and demands redress by this Court.

## VII.   ANTI-SLAPP STATEMENT

175. To the extent Defendants move to strike any claim in this Complaint pursuant to Cal. Civ. Proc. Code § 425.16, Plaintiff states as follows:

    a) No Claim Arises From Protected Activity. Each claim in this Complaint arises from Defendants' commercial conduct - the unauthorized extraction, replication, digitization, and commercial exploitation of Plaintiff's biometric facial likeness as a production asset - not from any act of free speech in connection with a public issue. Under *Park*, 2 Cal. 5th at 1060, the anti-SLAPP statute applies only when the protected activity is "the wrong complained of," not merely incidental to the wrong. The wrongful acts here - biometric extraction, maquette sculpting, digital scanning, pipeline distribution, and fraudulent

74

COMPLAINT FOR DAMAGES

concealment - are not communicative acts; they are commercial acts. No anti-SLAPP motion can properly reach them.

b)  Commercial Speech Exemption. Each Defendant is a person primarily engaged in the business of selling entertainment goods and services. Each claim arises from commercial statements and conduct made for the purpose of promoting and securing sales of Avatar products. Accordingly, Cal. Code Civ. Proc. § 425.17(c) independently bars any anti-SLAPP motion directed at these claims.

c)  Public Interest Exemption. Plaintiff's claims enforce important rights affecting the public interest - including the right of individuals to control the commercial use of their biometric likeness (Cal. Civ. Code § 3344, 1708.86) and the right to be free from non-consensual commercial appropriation of one's identity. Private enforcement of these rights is necessary and places a disproportionate financial burden on Plaintiff relative to her individual stake. Cal. Code Civ. Proc. § 425.17(b) therefore independently bars any anti-SLAPP motion.

d)  Probability of Prevailing. Even if the Court were to reach the second prong of the anti-SLAPP analysis, each claim satisfies the probability-of-prevailing standard under § 425.16(b)(1). Plaintiff has in her possession the following admissible evidence, each item of which independently establishes a prima facie case: (i) Cameron's own recorded public admissions from the 2024 Tech Noir museum exhibit identifying Plaintiff as the source of Neytiri's facial design; (ii) the original handwritten note signed by Cameron and delivered to Plaintiff in 2010 acknowledging his use of her likeness; (iii) sworn and on-record statements by Lightstorm lead character designer Jordu Schell confirming he worked from multiple photographs of Plaintiff under Cameron's direction; (iv) statements by Lightstorm character

75

**COMPLAINT FOR DAMAGES**

supervisor John Rosengrant describing the sculpt-to-scan pipeline that preserved Plaintiff's features; (v) production artwork published in Avatar: The Art of the Movie (2009) and Cameron's Tech Noir art book (2022) containing the Neytiri sketch derived from Plaintiff's photograph; (vi) behind-the-scenes footage from the 2023 Avatar Blu-ray re-release depicting Plaintiff's likeness in the design pipeline; (vii) Cameron's 2022 Total Film magazine interview in which he explicitly admitted using Plaintiff's face to design Neytiri; and (viii) Stan Winston School instructional materials depicting the precise character design workflow used on Avatar, from sketch through maquette to digital implementation. This evidence is more than sufficient to establish minimal merit on each count.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Q'ORIANKA KILCHER prays for judgment against Defendants, and each of them, as follows:

A. Compensatory Damages: For general and special damages in an amount to be proven at trial, including but not limited to:

- Economic losses (e.g., lost earnings, lost licensing fees, and lost prospective economic advantage) resulting from Defendants' unlawful use of Plaintiff's likeness and the interference with her career opportunities.

- Non-economic damages for Plaintiff's mental pain, suffering, humiliation, and emotional distress inflicted by Defendants' actions (including anxiety, embarrassment, and loss of enjoyment of life).

- Damages for injury to reputation and goodwill, including the harm to Plaintiff's professional and personal reputation caused by Defendants' false statements and false portrayals.

**76**

**COMPLAINT FOR DAMAGES**

B. Statutory Damages:

- Statutory damages under Civil Code § 3344(a) of no less than $750 per unauthorized use of Plaintiff's likeness (or, if greater, Plaintiff's actual damages for each such use), with the total to be determined at trial. (If multiple separate uses/violations are found, Plaintiff seeks an aggregated statutory award as allowed by law, including the possibility of trebled or enhanced statutory damages for knowing, willful misconduct.) Additionally, pursuant to 15 U.S.C.A. § 1117(a) under the Lanham Act, Plaintiff seeks: (i) all of Defendants' profits attributable to the false endorsement; (ii) Plaintiff's actual damages; (iii) treble damages for Defendants' willful and deliberate violations; (iv) prejudgment interest; and (v) reasonable attorney's fees and costs, this being an exceptional case. Plaintiff further reserves the right to elect any available statutory damages in lieu of actual damages and profits to the extent permitted under applicable law.

- Statutory damages under Civil Code § 1708.86(f)(1)(B) in the maximum amount permitted by that section. Plaintiff seeks $50,000 for the unauthorized creation and disclosure of the *Avatar* depiction of her likeness (and up to $250,000 if the trier of fact finds Defendants acted with malice, oppression, or fraud, as defined in the statute).

- Any other statutory penalties or fines applicable for Defendants' willful misconduct (including any available under related statutes or exemplary provisions, such as additional penalties for willful misappropriation or multiples thereof, as allowed by law).

C. Disgorgement of Profits: An order compelling Defendants to disgorge and pay to Plaintiff all profits attributable to the unauthorized use of Plaintiff's likeness and identity. This includes (but is not limited to) profits from the sale of *Avatar* tickets, merchandise, home media, or other products that the Court

77

COMPLAINT FOR DAMAGES

or jury finds were earned as a result of exploiting Plaintiff's likeness. (Plaintiff will seek an accounting to determine the portion of Defendants' *Avatar*-related revenues that is attributable to the use of her likeness, and asks that those profits be awarded to her on a restitutionary theory.)

D. Punitive and Exemplary Damages: An award of punitive damages sufficient to punish Defendants and deter such egregious conduct in the future, in light of Defendants' willful, malicious, and oppressive behavior. Defendants acted with conscious disregard for Plaintiff's rights and with despicable intent in exploiting a young woman's identity and lying about it. Plaintiff seeks punitive damages according to proof, in an amount appropriate to make an example of Defendants given their wealth and the scope of the wrongdoing. (For a corporate defendant like Disney, Plaintiff submits that an exemplary award should be significant enough to impact its operations or policies, subject to constitutional limits, to ensure the punitive purpose is achieved.)

E. Injunctive Relief: Permanent injunctive relief to protect Plaintiff's likeness and remove the offending content. This includes, but is not limited to:

- An order requiring Defendants to cease any further distribution or display of Plaintiff's likeness without consent. Specifically, to the extent *Avatar* or its sequels contain the Neytiri character modeled on Plaintiff, Defendants shall edit or remove Plaintiff's likeness from any future releases, broadcasts, or editions (unless and until they obtain Plaintiff's express consent). This could mean digitally altering the character's face in future distributions or adding appropriate credits/compensation if alteration is not feasible – whatever remedy the Court deems just to stop the ongoing exploitation.

- An order mandating Defendants to destroy or delete all digital files, models, scans, or other assets that incorporate Plaintiff's likeness (particularly those depicting sexual or intimate conduct) in their

78

**COMPLAINT FOR DAMAGES**

possession or control. This would include the original high-resolution facial scan/model used for Neytiri and any derivatives, to prevent any further use or leakage of those files.

- Injunctive relief requiring Defendants to refrain from using any artificial intelligence, CGI, or other technology to create any depiction of Plaintiff in any media without her express written consent. (This will guard against any future "deepfake" uses of her likeness by Defendants.)

- An order compelling Defendants to implement appropriate policies and training within their organizations (e.g., Lightstorm, Disney, etc.) to ensure compliance with publicity rights and the deepfake statute, so that no such unauthorized use of an individual's likeness occurs in the future. (This is a form of injunctive relief aimed at preventing recurrence.)

*(Plaintiff recognizes that **Avatar** is already publicly available, but these measures aim to limit future exploitation and set the stage for corrective action – e.g., edited versions or compensation.)*

F. Monitoring and Compliance: That the Court retain jurisdiction to monitor Defendants' compliance with any injunctive terms, and if necessary, appoint a third-party monitor (at Defendants' expense) to verify the removal of Plaintiff's digital likeness from their archives and to oversee adherence to the Court's orders. (This ensures enforcement of the injunctive relief.)

G. Declaratory Relief / Corrective Publication: An order requiring Defendants to issue a public statement or corrective notice acknowledging Plaintiff's contributions and correcting any false or misleading statements about her. This may include:

- Publishing a written apology and clarification in a prominent trade publication (such as *Variety* or *The Hollywood Reporter*) and on official

79

**COMPLAINT FOR DAMAGES**

*Avatar*/Disney social media channels, stating that Plaintiff's likeness was used without her permission and that any prior implication she was unavailable or uninvolved was inaccurate.

- Providing Plaintiff with a platform in the ***Avatar*** sequel press materials (e.g., an interview segment on a behind-the-scenes featurette or a dedicated section in future art books) to share her story, if she so chooses, as a form of reputational repair and acknowledgment of her role.

- Notifying any known recipients of the false "she was busy with another movie" story (for example, any crew or colleagues Cameron told this to) that the statement was false and should not be repeated.

These measures will help undo some of the reputational harm and set the record straight in the industry and public.

H. Attorney's Fees and Costs: For recovery of reasonable attorney's fees and litigation costs incurred by Plaintiff, as authorized by statute or other applicable law. Under Civil Code § 3344(a), the prevailing party is entitled to attorney's fees and costs (Plaintiff thus seeks hers for that claim). Likewise, Civil Code § 1708.86(f)(1)(D) provides for attorney's fees to a prevailing depicted individual. Additionally, any other applicable fee-shifting provisions (or equitable grounds such as California's private attorney general statute, if applicable) are invoked. Plaintiff asks that the Court award full compensation for the legal expenses required to vindicate her rights in this action.

I. Prejudgment Interest: For an award of prejudgment interest on all liquidated or readily ascertainable sums, from the date of injury or loss, according to Civil Code § 3288 and any other applicable law, to compensate Plaintiff for the time value of money lost due to Defendants' actions. (For example, interest on the value of a license fee from 2009 to present, etc.)

**80**

**COMPLAINT FOR DAMAGES**

J.  Further Relief: For such other and further relief as the Court deems just and proper. Given the unprecedented nature of some of Defendants' conduct (e.g., early use of deepfake-like technology on a minor), Plaintiff prays that the Court fashion any appropriate equitable remedies to do complete justice. By way of example, the Court might consider imposing a constructive trust over a portion of Defendants' *Avatar*-related profits for Plaintiff's benefit, or requiring Defendants to fund a charitable initiative of Plaintiff's choosing (such as an Indigenous rights or child performers' rights fund) as a form of equitable relief aligned with the themes they profited from. Plaintiff leaves the scope of "further relief" broad, in trust of the Court's equitable powers.

## IX.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action so triable in this Complaint.

Dated: May 5, 2026                      PETER LAW GROUP

By: _____
Arnold P. Peter
Attorney for Plaintiff
Q'ORIANKA KILCHER

Dated: May 5, 2026                      LAW OFFICE OF ASHER HOFFMAN, APC

                                        /S/ Asher Hoffman
By: _____
Asher Hoffman
Attorney for Plaintiff
Q'ORIANKA KILCHER

81

**COMPLAINT FOR DAMAGES**

## X.   LIST OF FIGURES

The following images and visual comparisons are provided to assist the Court and the ultimate trier of fact in evaluating the allegations regarding the development of the Na'vi character Neytiri and its relationship to the likeness of actress Q'orianka Kilcher. The images attached hereto illustrate the concept artwork, reference photographs, sculpted maquettes, and comparative analyses discussed in the factual allegations. The figures are presented in the order of Plaintiff's discovery of the evidence, tracing the chain of misappropriation from Cameron's own public admission through the underlying design pipeline and culminating in the final facial comparisons.

82

**COMPLAINT FOR DAMAGES**



C'est le bas de son visage.

**Figure 1 – High-resolution image of the original Neytiri production sketch with Cameron's admission that "actual source for this was a photograph that was in the LA Times as part of the promotion for the NEW WORLD [motion picture]. There's a young actress named Q'orianka Kilcher who played Pocahontas in the NEW WORLD. So, this is actually her, . . . her lower face. She had a very interesting face." YOUTUBE Channel KONBINI Featurette (uploaded April 11, 2024).**

83

COMPLAINT FOR DAMAGES



**Figure 2 – Production still of Plaintiff Q'orianka Kilcher as source for facial characteristics in character development. YOUTUBE Channel KONBINI Featurette (uploaded April 11, 2024).**

84

**COMPLAINT FOR DAMAGES**

ORIGINAL JAMES CAMERON SKETCH

**Figure 3 – Avatar behind-the-scenes image capture from DVD footage frame showing the Neytiri production artwork used during the design phase.**

85

**COMPLAINT FOR DAMAGES**



**Figure 4 – Original Neytiri maquette bust attributed to James Cameron showing facial proportions and design elements based on Plaintiff Q'orianka Kilcher's facial structure.**

86

**COMPLAINT FOR DAMAGES**

**Figure 5 – Side-by-side comparison of a Neytiri maquette and Plaintiff Q'orianka Kilcher, highlighting similarities in facial structure.**

87

**COMPLAINT FOR DAMAGES**



**Figure 6 – Third sculpted Neytiri maquette bust derived from Cameron's original production sketch, illustrating the direct physical replication of Plaintiff Q'orianka Kilcher's facial geometry in three-dimensional sculptural form under Defendant Cameron's direction.**

**COMPLAINT FOR DAMAGES**



**Figure 7 – Behind-the-scenes image of James Cameron reviewing Neytiri maquettes during production. Article acknowledges the use of Plaintiff Q'orianka Kilcher as original source.**

**COMPLAINT FOR DAMAGES**



**Figure 8 – Multiple sculpted maquette iterations used during development of the Neytiri character, sourced from lead character designer Jordu Schell's records.**

90

**COMPLAINT FOR DAMAGES**



**Figure 9 – Close-up comparison emphasizing alignment of eye shape, nose structure, and mouth geometry as published in Avatar: The Art of the Movie (2009), demonstrating the direct replication of Plaintiff Q'orianka Kilcher's facial features in the Neytiri character design.**

91





**Figure 10 – Close-up comparison emphasizing alignment of eye shape, nose structure, and mouth geometry as published in Avatar: The Art of the Movie (2009), demonstrating the direct replication of Plaintiff Q'orianka Kilcher's facial features in the Neytiri character design.**

92

**Figure 11 – Avatar Supervisor John Rosengrant visual effects course materials demonstrating the Na'vi facial modeling and rendering workflow. Top left sketch and sculpture shows Plaintiff Q'orianka Kilcher as original source.**

93



**Figure 12 – Digital scan and iterations illustrating the transition from physical sculpture to digital model in the Avatar VFX pipeline.**

94



**Figure 13 – Reference photograph of Plaintiff Q'orianka Kilcher showing the foundational development of the Na'vi character Neytiri.**

**COMPLAINT FOR DAMAGES**

**Figure 14 – James Cameron's original Na'vi production sketch with sculptural maquette bust and final digital render, presented as a final composite comparison demonstrating the end-to-end replication of Plaintiff Q'orianka Kilcher's facial likeness across the Avatar production pipeline.**

96

**COMPLAINT FOR DAMAGES**